**Petition for Naturalization of Antonio OLEGARIO, Petitioner-Appellee,**

v.

**UNITED STATES of America, Respondent-Appellant.**

**No. 717, Docket 79–6179.**

United States Court of Appeals, Second Circuit.

Argued Feb. 15, 1980.

Decided July 16, 1980.

Daniel M. Gillen, New York City (Glassman & Elias, Steven Elias and Edward Bernstein, New York City, of counsel), for petitioner-appellee.

Robert S. Groban, Jr., Sp. Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. for the Southern District of New York, Michael H. Dolinger, Asst. U. S. Atty., New York City, of counsel), for respondent-appellant.

Association of Immigration and Nationality Lawyers (Jack Wasserman, Washington, D. C., and Donald L. Ungar, San Francisco, Calif., of counsel), amicus curiae.

Before OAKES, Van GRAAFEILAND, Circuit Judges, and TENNEY, District Judge.*

TENNEY, District Judge:

The historical and political events giving rise to this appeal began almost four decades ago at the beginning of the United States' involvement in World War II. In response to the deteriorating situation in the Pacific, President Roosevelt issued an order on July 26, 1941 calling all organized military units of the Commonwealth of the Philippines into the armed forces of the United States. On March 27, 1942, Congress amended the Nationality Act of 1940, Pub.L. No. 76–853, 54 Stat. 1137 ("the 1940 Act"), to provide for the naturalization of non-citizens who served in the United States armed forces, Second War Powers

---

* Hon. Charles H. Tenney of the United States District Court for the Southern District of New York, sitting by designation.

Act, Pub.L. No. 77–507, § 1001, 56 Stat. 182.[1] Section 701 exempted certain noncitizen servicemen who served outside the continental United States from some of the usual naturalization requirements, such as a period of residence in this country and literacy in English. Section 702 provided for the overseas naturalization of persons eligible under section 701 who were in active service in the United States military and were not within the jurisdiction of any court authorized to naturalize aliens. Section 705 directed the Commissioner of Immigration and Naturalization ("Commissioner"), with the approval of the Attorney General, to prescribe and furnish forms and make such rules and regulations as were necessary to implement the Act. As amended by subsequent statutes, the 1940 Act ultimately specified that all naturalization petitions filed under section 701 had to be submitted by December 31, 1946. Act of

1. The new provisions provided:

Sec. 701. Notwithstanding the provisions of sections 303 and 326 of this Act, any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war and who, having been lawfully admitted to the United States, including its Territories and possessions, shall have been at the time of his enlistment or induction a resident thereof, may be naturalized upon compliance with all the requirements of the naturalization laws except that (1) no declaration of intention and no period of residence within the United States or any State shall be required; (2) the petition for naturalization may be filed in any court having naturalization jurisdiction regardless of the residence of the petitioner; (3) the petitioner shall not be required to speak the English language, sign his petition in his own handwriting, or meet any educational test; and (4) no fee shall be charged or collected for making, filing, or docketing the petition for naturalization, or for the final hearing thereon, or for the certification of naturalization, if issued: *Provided, however,* That . . . (3) the petition shall be filed not later than one year after the termination of the effective period of those titles of the Second War Powers Act, 1942, for which the effective period is specified in the last title thereof. The petitioner may be naturalized immediately if prior to the filing of the petition the petitioner and the witnesses required by the foregoing proviso shall have appeared before and been examined by a representative of the Immigration and Naturalization Service.

Sec. 702. During the present war, any person entitled to naturalization under section 701 of this Act, who while serving honorably in the military or naval forces of the United States is not within the jurisdiction of any court authorized to naturalize aliens, may be naturalized in accordance with all the applicable provisions of section 701 without appearing before a naturalization court. The petition for naturalization of any petitioner under this section shall be made and sworn to before, and filed with, a representative of the Immigration and Naturalization Service designated by the Commissioner or a Deputy Commissioner, which designated representative is hereby authorized to receive such petition in behalf of the Service, to conduct hearings thereon, to take testimony concerning any matter touching or in any way affecting the admissibility of any such petitioner for naturalization, to call witnesses, to administer oaths, including the oath of the petitioner and his witnesses to the petition for naturalization and the oath of renunciation and allegiance prescribed by section 335 of this Act, and to grant naturalization, and to issue certificates of citizenship: *Provided,* that the record of any proceedings hereunder together with a copy of the certificate of citizenship shall be forwarded to and filed by the clerk of a naturalization court in the district in which the petitioner is a resident and be made a part of the record of the court.

Sec. 703. The ninety days' notice required by subsection (b) of section 326 of this Act to be given by the clerk of the naturalization court to the Commissioner may be waived by the Commissioner in his discretion. In any petition in which such notice is waived the Commissioner shall cause the clerk of the court to be notified to that effect.

Sec. 704. The provisions of this title shall not apply to (1) any person who during the present war is dishonorably discharged from the military or naval forces or is discharged therefrom on account of his alienage, or (2) any conscientious objector who performed no military duty whatever or refused to wear the uniform: *Provided,* That citizenship granted pursuant to this title may be revoked as to any person subsequently dishonorably discharged from the military or naval forces in accordance with Section 338 of this Act; and such ground for revocation shall be in addition to any other provided by law.

Sec. 705. The Commissioner, with the approval of the Attorney General, shall prescribe and furnish such forms, and shall make such rules and regulations, as may be necessary to carry into effect the provisions of this Act.

Dec. 28, 1945, Pub.L. No. 79–270, § 202(c)(1), 59 Stat. 658.[2]

Pursuant to the Act, Immigration and Naturalization Service (INS) officers were sent to overseas military posts to naturalize noncitizen members of the United States armed forces. Between 1943 and 1946, these officers traveled from post to post through England, Iceland, North Africa, and the Pacific naturalizing thousands of foreigners. *Matter of Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931, 935 (N.D.Cal.1975) (hereinafter cited as *68 Veterans*). Although the Act could not be effectuated in the Philippines during the Japanese occupation, from 1942 to 1945, approximately 7,000 Filipinos were naturalized in the United States or at military posts outside the Philippines. Memorandum for the Attorney General from Assistant Solicitor General Hugh B. Cox, dated June 23, 1945 ("Cox Memorandum"), at 2. Implementation of the Act commenced there following the liberation of the Philippines and the resolution of statutory interpretation questions concerning the eligibility of Filipino servicemen under section 701–702.[3] In August 1945, George H. Ennis, Vice Consul of the United States at Manila, was designated to naturalize aliens under the Act and naturalizations in the Philippines began.

The Philippines were scheduled to become an independent, self-governing country on July 4, 1946, less than one year after Vice Consul Ennis began naturalizing eligible Filipinos. See Philippine Independence Act of 1934, Pub.L. No. 73–127, § 10(a), 48 Stat. 463. Apparently, the Philippine government feared that a mass emigration of newly naturalized Filipinos to the United States would drain the country of much needed manpower and thwart post-war reconstructive efforts. See Memorandum to Ugo Carusi, INS Commissioner, from Edward J. Shaughnessy, Special Assistant to the Commissioner, dated October 19, 1945 ("Shaughnessy Memorandum I"), at 1. This concern was conveyed to the United States Department of State which passed the information on to the Commissioner. On September 13, 1945, the Commissioner wrote to the Attorney General:

> The Philippine Government again has expressed to the Department of State its concern because Filipino members of the armed forces of the United States are being naturalized even though they have always been domiciled in the Philippine Islands. . . . In view of the concern expressed by the Philippine Government, it is my belief that the situation might best be handled by revoking the authority previously granted to Mr. Ennis and by omitting to designate any representative authorized to confer citizenship in the Philippine Islands. This course would eliminate a source of possible embarrassment in our dealings with the Philippine people, who probably will be awarded independence in the near future.

Memorandum to Tom C. Clark, Attorney General, from Ugo Carusi, INS Commissioner, dated September 13, 1945 ("Carusi

---

**2.** The relevant provision provided:
> Section 701 of such title is amended by striking out "and (3) the petition shall be filed not later than one year after the termination of the effective period of those titles of the Second War Powers Act, 1942, for which the effective period is specified in the last title thereof" and inserting in lieu thereof "and (3) the petition shall be filed not later than December 31, 1946."

**3.** Two issues that were examined and resolved by the INS, the Commissioner and the Attorney General were (1) whether service in the Army of the Philippine Commonwealth pursuant to the President's 1941 Order qualified as service in the United States armed forces; and (2) whether residence in the Philippines satisfied the statutory requirement that the applicant have been "lawfully admitted into the United States, including its Territories and possessions." Both of these questions were answered in the affirmative. See Memorandum to Ugo Carusi, INS Commissioner, from L. Paul Winings, General Counsel, dated February 5, 1945; Memorandum to Thomas B. Shoemaker, Deputy Commissioner, from Henry B. Hazard, Director of Research and Educational Services, dated February 7, 1945; Memorandum for the Attorney General from Hugh B. Cox, Assistant Solicitor General, dated June 23, 1945. The INS subsequently reversed its position regarding the first issue in response to a congressional enactment. See nn.4 & 5, *infra*.

Memorandum"), at 2. The Attorney General adopted the Commissioner's recommendation on September 26, 1945 and revoked Vice Consul Ennis's naturalization authority. Notice of the revocation did not reach him for several weeks, however, and Ennis continued to naturalize aliens until October 26, 1945. *68 Veterans,* supra, 406 F.Supp. at 936. As succinctly stated in an internal INS memorandum, the revocation of the Vice Consul's naturalization authority created "the rather anomalous situation that while we recognize in law the legal right of these persons to the benefits under the Act we have, from an administrative standpoint, made it impossible for such persons to acquire these benefits." Shaughnessy Memorandum I, at 1.

Several months after the Philippines lost its naturalization representative, Congress enacted a statute that appropriated funds for the Philippine Army and provided that service in that Army, pursuant to President Roosevelt's 1941 order, was not to be deemed service in the United States armed forces. First Supplemental Surplus Appropriation Rescission Act of February 18, 1946, Pub.L. No. 79–301, 60 Stat. 14.[4] The INS had previously concluded that service in the Philippine Army satisfied the section 701 naturalization requirement of active service in the United States armed forces. In response to this new piece of legislation, the INS reversed its earlier position and adopted the view that Filipinos inducted into the Commonwealth Army under the President's military order were not eligible for naturalization under the 1940 Act because they had not served in the United States military. Memorandum to T. B. Shoemaker, Acting INS Commissioner, from L. Paul Winings, General Counsel, dated July 10, 1946.[5] This statute presumably did not affect the eligibility of Filipinos who individually joined the United States military subsequent to the "mass enrollment" provoked by the President's order. See Memorandum to Ugo Carusi, INS Com-

4. The statute provided in part:
 That service in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the armed forces of the United States pursuant to the military order of the President of the United States dated July 26, 1941, shall not be deemed to be or to have been service in the military or naval forces of the United States or any component thereof for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the military or naval forces of the United States or any component thereof, except benefits under (1) the National Service Life Insurance Act of 1940, as amended, under contracts heretofore entered into, and (2) laws administered by the Veterans' Administration providing for the payment of pensions on account of service-connected disability or death: *Provided further,* That such pensions shall be paid at the rate of one Philippine peso for each dollar authorized to be paid under the laws providing for such pensions: *Provided further,* That any payments heretofore made under any such law to or with respect to any member of the military forces of the Government of the Commonwealth of the Philippines who served in the service of the armed forces of the United States shall not be deemed to be invalid by reason of the circumstances that his service was not service in the military or

naval forces of the United States or any component thereof within the meaning of such law.

5. According to the government, the INS maintained this position until 1957 when *Petition for Naturalization of Munoz,* 156 F.Supp. 184 (N.D. Cal.1957), was decided. The petitioner in *Munoz* had served in the United States armed forces (as a member of the Philippine Commonwealth Army) and was granted admission for permanent residence by a private congressional act. The naturalization examiner recommended that Munoz's naturalization petition be denied on the grounds that the appropriations statute, see n.4, "took away" the right to summary naturalization. The court rejected this contention and concluded that Congress did not intend the statute to affect the rights and privileges accorded by the naturalization laws. As an alternative basis for its decision, the court noted that Munoz was eligible for citizenship under section 403(b) of the 1952 Act, 8 U.S.C. § 1440(b), because he was a lawfully admitted permanent resident of the United States. To the extent the appropriations statute was inconsistent with this provision of the 1952 Act, the court concluded that the former did not apply. In the case at bar, the government does not rely on the appropriations statute as grounds for denying Olegario's petition and Olegario is not eligible for citizenship under section 403(b) of the 1952 Act.

missioner, from L. Paul Winings, General Counsel, dated February 5, 1945 (discussing eligibility of each group of servicemen prior to enactment of the appropriations statute). However, the INS's interpretation of this provision greatly reduced the number of Filipino servicemen who could qualify for citizenship under sections 701–702. Government's Brief at 8.

The INS appointed a new naturalization representative for the Philippines, P. J. Phillips, who began processing petitions in August 1946. From that time until the Act expired (December 31, 1946), Phillips naturalized approximately 4,000 Filipinos pursuant to section 702. *68 Veterans, supra,* 406 F.Supp. at 936. No INS official was present in the Philippines to implement the Act during the nine month period after Ennis's naturalization authority was revoked and before Phillips was appointed.

Petitioner Antonio Olegario, a sixty-one year old Philippine citizen, served in the Army of the Commonwealth of the Philippines from December 20, 1941 to December 2, 1945.[6] Although Olegario was eligible to apply for naturalization during the brief two to three month period that Ennis served as an INS representative in the Philippines, he did not take any action in this matter. Of course, his inaction is not surprising since many Filipino soldiers, isolated and imprisoned during the Japanese occupation, were unaware of the opportunity to apply for naturalization. *See In Re Petition for Naturalization of Neria,* No. 67485, slip op. at 25–26 (Aug. 29, 1979) (hereinafter, *Petition of Neria*). Ennis's naturalization authority was effectively revoked on October 26, 1945. The petitioner remained eligible for naturalization under the 1940 Act until December 2, 1945 when his service in the Philippine Army ended. Therefore, for about five weeks from October 26th to December 2d, Olegario apparently qualified for United States citizenship, but no INS

representative was present in the Philippines to accept his petition.

Olegario concedes that he neither filed a timely naturalization petition nor made any attempt to do so. He contends, however, that his constitutional rights were violated by "the arbitrary action of the Commissioner . . ., with the approval of the Attorney General, which resulted in the removal of the Vice Consul from the Philippines during 1945–46 . . . and precluded petitioner, and Filipino servicemen similarly situated, from exercising the opportunity to become naturalized pursuant to Sections 701–702 of the [Act]." Brief of Petitioner-Appellee ("Petitioner's Brief"), at 25. The district court agreed with this contention and, reversing a decision rendered by an INS naturalization examiner, granted Olegario's naturalization petition. Relying on Judge Renfrew's comprehensive opinion in the *68 Veterans* case, *supra,* Judge Knapp concluded that the petitioner "had been denied due process of law in a manner which could only be remedied by now admitting [him] to citizenship." While recognizing the import of Judge Renfrew's discussion, and the substantial arguments made by the petitioner and amicus on appeal, we are constrained to disagree with that result.

Several preliminary issues and arguments must be addressed before the constitutional question presented by this appeal can be fully examined. These issues, in turn, require some further background discussion of legislative history and prior cases involving Filipino veterans seeking United States citizenship.

*Statutory and Case Law Background*

In 1952, Congress enacted a new Immigration and Nationality Act that appeared to extinguish some of the naturalization rights granted to alien servicemen under the 1940 Act. Immigration and Nationality

---

**6.** The district court apparently adopted the naturalization examiner's finding that Olegario was discharged from the armed forces on December 2, 1945. See *Petition for Naturalization of Antonio Olegario,* 473 F.Supp. 185 (S.D. N.Y.1979). Olegario's Application to File Peti- tion for Naturalization stated that he was discharged on July 4, 1946 and, at the district court hearing, he testified that he was discharged from the army on July 1, 1946. Tr. 2. On appeal, the petitioner does not dispute the district court's finding of fact.

Act of 1952, 66 Stat. 242, codified at 8 U.S.C. §§ 1427 et seq. ("1952 Act"). Specifically, the 1952 Act required that the applicant had either enlisted in the military while located in a qualifying geographic area that did not include the Philippines, or been lawfully admitted to the United States for permanent residence. 8 U.S.C. § 1440(a). Yet the 1952 Act also included a savings clause that was relied upon by aliens who claimed that their rights under the 1940 Act had been preserved. This argument was accepted by the courts, and citizenship was granted to certain aliens who would otherwise have been ineligible under the 1952 Act. *See, e. g., United States v. Menasche*, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *Medalion v. United States*, 279 F.2d 162 (2d Cir. 1960); *United States v. Wolff*, 270 F.2d 422 (3d Cir.), *cert. denied*, 362 U.S. 928, 80 S.Ct. 753, 4 L.Ed.2d 746 (1960). Congress, however, disagreed with the courts' interpretation of the statute. In 1961 Congress amended the 1952 Act to provide:

> Notwithstanding the provisions of Section 405(a) [the savings clause], any petition for naturalization filed on or after September 26, 1961 shall be heard and determined in accordance with the requirements of this subchapter.

Act of September 26, 1961, 75 Stat. 650, codified at 8 U.S.C. § 1421(e). The House Judiciary Committee's Report on the amendment clearly explains Congress's intent in enacting this measure.

> The purpose of this amendment is to overcome interpretations placed upon the savings clause (sec. 405) of the Immigration and Nationality Act (*United States v. Menasche*, [supra], *United States v. Wolff*, [supra], *Medalion v. United States*, [supra]), holding in effect, that residence in the United States before December 24, 1952, was sufficient to confer naturalization rights under the Nationality Act of 1940, as amended, notwithstanding its repeal on that date by the Immigration and Nationality Act. As a consequence, petitioners of this class are being considered eligible, 9 years after its repeal, for naturalization under the 1940 law, and, if

more favorable to the circumstances in their cases, they may elect to claim the benefits of the Immigration and Nationality Act. This, notwithstanding the fact that the petition for naturalization was not filed until after December 24, 1952, when the Immigration and Nationality Act became effective.

> In the opinion of the committee, such interpretations are contrary to the intent of Congress clearly indicated in the basic Immigration and Nationality Act. The administration of two nationality laws simultaneously is cumbersome, inefficient, and unfair to other applicants for naturalization. In accordance with the original purpose of the Immigration and Nationality Act, this clarifying amendment will make it amply apparent that from and after its enactment the requirements and provisions of the Immigration and Nationality Act will be uniform and will apply to all petitioners for naturalization.

[1961] U.S.Code Cong. & Ad. News, pp. 2981–82.

After this explicit statement of congressional intent regarding the 1952 Act's savings clause, petitioners seeking naturalization under the 1940 Act presented the courts with more creative arguments. In *INS v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), a Filipino who had served in the United States armed forces applied for naturalization under the 1940 Act in September 1967. Hibi argued that the government was estopped from relying on the statute's expiration date and time limit because it had failed to advise him of his rights under the Act during the time he could have applied and had failed to provide an INS representative in the Philippines during the entire time he was eligible for naturalization. The district court agreed with Hibi's contentions, and its decision was upheld by the Court of Appeals for the Ninth Circuit. Without hearing oral argument in the case, the Supreme Court summarily reversed the Ninth Circuit in a brief per curiam opinion from which three justices dissented. The Court held that al-

though *Montana v. Kennedy*, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), left open the question whether the government's "affirmative misconduct" could estop it from denying citizenship, "no conduct of the sort there adverted to was involved here." 414 U.S. at 8, 94 S.Ct. at 22.

Affirmative misconduct, as well as constitutional violations, were found by the district court in *68 Veterans, supra,* which involved a similar challenge to the withdrawal of naturalization authority from the Philippines. The petitioners in that case were sixty-eight Filipinos who had served in the United States armed forces during World War II and were seeking naturalization pursuant to section 702 of the 1940 Act. Judge Renfrew divided the petitioners into three categories. Category I included those who had taken affirmative action amounting to "constructive filing" of a naturalization petition prior to December 31, 1946. Category II consisted of those veterans who were eligible for citizenship under the 1940 Act but made no efforts to file a petition before the Act expired. Category III included those petitioners who were in the same position as those in Category II except that they had no proof that they served in the United States military as required by Section 701.

Judge Renfrew held that the Category I petitioners should be granted citizenship because, unlike Hibi, they had presented evidence of affirmative misconduct by the government and had taken steps amounting to the "constructive filing" of naturalization petitions. With respect to Category II, the judge ruled that "the failure of the Government to have stationed in the Philippine Islands a representative of the INS authorized to naturalize members of the American armed forces pursuant to Section 702 of the Nationality Act of 1940 during all of the times those statutory rights were available denied petitioners due process of law." 406 F.Supp. at 951. Category III petitioners were granted ninety days before their petitions would be dismissed to provide proof of service in the American armed forces.

Judge Renfrew's constitutional analysis began with the determination that these petitioners, although not citizens, were protected by the due process clause of the Fifth Amendment during the time that the INS representative was withdrawn from the Philippines. Upon reviewing the Philippine Independence Act and various definitions in the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(3), (22), (31), he concluded that Filipinos were nationals of the United States until July 4, 1946 when the country became fully independent.[7]

---

7. Judge Renfrew reasoned as follows:

Even after passage of the Philippine Independence Act all citizens of the Philippines continued to owe allegiance to the United States. 48 Stat. 456, § 2(a)(1). The significance of "owing allegiance" to a state is best understood by reference to the immigration and nationality laws, specifically Sections 1101(a)(3), (22) and (31) of 8 U.S.C. Section 1101(a)(3) defines the term "alien" as "any person not a citizen or national of the United States." Section 1101(a)(22) defines "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." Finally, the definition of "permanent" in Section 1101(a)(31) indicates that the status of the Philippines' citizens was not altered by the fact that their allegiance to the United States terminated on July 4, 1946. Thus it is clear from these definitions that passage of the Philippine Independence Act did not impose alien status on all citizens of the Philippine Islands. Rather, Filipinos were nationals of the United States until July 4, 1946, the date of complete independence for the Philippines.

Furthermore, the Act itself, when read in its entirety, does not establish that that Act immediately transformed the Philippines into a foreign country and its citizens into aliens. The sections of the Act relied upon by the Government show no more than that for certain purposes the Philippine Islands would be treated as a foreign country. The overwhelming thrust of the Act, however, is that until it achieved complete independence, the Philippines would remain subject to the control and sovereignty of the United States, although American sovereignty would be exercised selectively. Although the Philippines enjoyed the status of an independent country in some respects, as was reflected in its relations with the international community, it is oversimplification to conclude that after 1934 the Philippines enjoyed all attributes of a completely independent sovereign state.

Furthermore, the Philippine Independence Act "evidence[d] an unmistakable Congressional intent to preserve for Filipinos basic civil rights." *Id.* at 942. Judge Renfrew stated that while the petitioners were United States nationals, their constitutional rights were the same as those of noncitizen residents of the United States. *Id.* at 949–50. In his view, the government had to show a compelling interest to justify its decision to withdraw the naturalization officer from the Philippines because the action had discriminated against Filipinos, an inherently suspect class. *Id.* at 950. The court ruled that the government failed to carry this heavy burden.

> Although the Court has no doubt that the actions of the Commissioner of the INS were motivated by reasonable concern for the maintenance of amicable relations between the United States and the Philippine Islands, that concern alone, when considered in light of the suspect nature of the classification herein, and the strictness of the applicable constitutional standard, is insufficient justification for violating petitioners' rights.

*Id.* at 951.

The government appealed the decision in *68 Veterans.* However, the Department of Justice subsequently moved to dismiss the appeal on the basis of a recommendation by the Commissioner. On November 30, 1977, an order dismissing the Ninth Circuit appeal was entered.

After the appeal was dismissed, the government reevaluated its policy regarding Category I and Category II petitioners. The government has now adopted Judge Renfrew's view with respect to Category I cases and will not oppose these petitions because it is conceded that these aliens were prejudiced by the government's failure to process their applications in 1945 and 1946. However, the government strongly disagrees with Judge Renfrew's decision

that Category II petitioners should be granted citizenship because they were previously denied due process of law. In Category II cases, the government will not oppose naturalization only if the application was filed before the appeal in *68 Veterans* was withdrawn. The reason offered to support this differentiation among Category II cases is that "the failure of these applicants to press their cases to judgment could have resulted from their expectation that they would receive the same treatment as the aliens in [*68 Veterans*]." Brief of Respondent-Appellant ("Government's Brief") at 14. Pursuant to this policy, several other appeals have been withdrawn. This case has been pursued, however, because Olegario filed his naturalization petition after November 30, 1977.

*Collateral Estoppel and Failure to Appeal*

■ The Association of Immigration and Nationality Lawyers ("Association"), which has submitted an amicus brief supporting the petitioner, argues that the collateral estoppel effect of the decision in *68 Veterans* precludes the government from contesting the decision of the district court in this case. According to the Association, *68 Veterans* resolved the precise issue raised in this case, and "having failed to prosecute its appeal . . ., [the government] should be prohibited, on the principle of collateral estoppel, from litigating the same issue all over again." Brief of Association of Immigration and Nationality Lawyers, Amicus Curiae ("Amicus Brief") at 10. The Association's argument relies on the Supreme Court's decision in *Parklane Hosiery Co., v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), which approved the use of "offensive" collateral estoppel under certain circumstances. While the government agrees that *Parklane* is critical to this determination, it disagrees with the Association's application of the case and contends that collateral estoppel should not be applied here. The court concurs.

Such a conclusion not only ignores the clear import of the 1934 Act and the subsequent complex pattern of Philippine-United States relations, but flies in the face of settled judicial authority. Soon after passage of the Independence Act, for example, it was held

that "[s]o far as the United States is concerned, the Philippine Islands are not yet foreign territory." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 319, 57 S.Ct. 764, 769, 81 L.Ed. 1122 (1937).
406 F.Supp. 941–42 (footnotes omitted).

The *Parklane* Court upheld the "offensive use of collateral estoppel," which it defined as "a plaintiff . . . seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Id.* at 329, 99 S.Ct. at 650. Noting that courts have "broad discretion" in applying the doctrine, the Court ruled that collateral estoppel should not be applied when the plaintiff could have easily joined the prior action or when it would be unfair to the defendant. Neither circumstance was present in that case, which involved a stockholders' class action for securities fraud that was instituted after a successful SEC action challenging the defendants' conduct.

In contrast to *Parklane*, the government is the defendant here, and the case raises important issues of national concern. As stated by the government "a determination to forego further judicial review of an adverse decision, as in [*68 Veterans*], may result from a variety of factors—scarcity of resources, potential impact, public interest—which are unrelated to the legal issues in the case." Reply Brief of Respondent-Appellant ("Government's Reply Brief") at 3–4. If each adverse decision were accorded the collateral estoppel effect urged by the Association, the Solicitor General would be forced to seek review of cases that would not otherwise be appealed. "While the Solicitor General apparently thought the problem of Filipino War Veterans would end with [*68 Veternas*], the case has spurred litigation rather than settled the issue." *Id.* at 4–5. None of these subsequent cases was decided on the grounds that the *68 Veterans* decision collaterally estopped the government from contesting the naturalization petition. Nor will we resolve the case at bar by relying on the collateral estoppel doctrine.

The Association also contends that denial of Olegario's petition would constitute a due process violation because the government failed to contest the naturalization of similarly situated petitioners in the *68 Veterans* case and other applicants who filed their petitions before November 30, 1977, when the *68 Veterans* appeal was withdrawn. In the Association's view, the government offers "no rational basis" for distinguishing between the two groups of petitions and the "arbitrary cutoff date has no bearing whatever to one applicant's eligibility over another's." Amicus Brief at 13. The government, in turn, contends that it had an affirmative duty to review its decision to withdraw the appeal once it became evident that the impact and practical consequences of the *68 Veterans* decision were much more substantial than had originally been anticipated. *See Bentex Pharmaceuticals, Inc. v. Richardson*, 463 F.2d 363, 368 n.17 (4th Cir. 1972), *rev'd on other grounds sub nom. Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973). The government describes its policy of not contesting any petitions that were filed before the appeal was withdrawn as "an attempt to draw the line on the claims of Filipino war veterans while at the same time according those who had not adopted a 'wait and see' attitude the benefits obtained by the aliens in [*68 Veterans*]." Government's Reply Brief at 5.

While the court agrees that the government's cutoff date is unrelated to an applicant's eligibility, this observation is also besides the point. The government was entitled to reassess its initial view of the decision and to reverse its position on the case. Even after the appeal was dropped, the government apparently could have challenged other petitions filed before withdrawal of the appeal. The cutoff date, although somewhat confusing, thus appears to benefit petitioners who would otherwise be subject to the same government challenge asserted here.

The government's failure to appeal the *68 Veterans* decision may have suggested to some applicants that they could not successfully seek naturalization under the 1940 Act despite Congress's restrictive interpretation of the savings clause and the Supreme Court's opinion in *Hibi.* However, neither the petitioner nor amicus allege that any authorized government official discouraged

applicants from filing petitions while the appeal was pending or affirmatively represented that naturalization rights under the 1940 Act were now secure. This case, therefore, does not involve "a serious injustice" created by the government's "wrongful conduct" that would justify estopping the government from adopting its current position in this case. *See Union Oil Co. v. Morton*, 512 F.2d 743, 748 n.2 (9th Cir. 1975); *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir. 1973); *Lau, Wun Man v. INS*, 426 F.2d 689, 690 (3d Cir. 1970). Furthermore, judicial and administrative officers are generally allowed wide discretion and considerable latitude in determining when to file cases or pursue appeals. *See United States v. Swanson*, 509 F.2d 1205, 1208 (8th Cir. 1975); *Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375, 379–82 (2d Cir. 1973); *Terminal Freight Handling Co. v. Solien*, 444 F.2d 699, 708 (8th Cir. 1972), *cert. denied*, 405 U.S. 996, 92 S.Ct. 1246, 31 L.Ed.2d 465 (1972). Despite "mistaken action or lack of action on the part of public officials," a government agency may reverse its position and apply a new policy to the parties before it. *Maxwell Co. v. NLRB*, 414 F.2d 477, 479 (6th Cir. 1969), *quoting NLRB v. Baltimore Transit Co.*, 140 F.2d 51, 54–55 (4th Cir.), *cert. denied*, 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084 (1944); *see Sierra Club v. Leslie Salt Co.*, 412 F.Supp. 1096, 1103–04 (N.D. Cal.1976). The government's decision to pursue this appeal while not contesting the petitions of other similarly situated applicants does not deprive Olegario of due process of law.

**8.** The petitioner and the Association contend that the government is precluded from raising the justiciability claim on appeal because it did not argue the political question issue before the district court. This contention is without merit. First, the district court relied heavily on the *68 Veterans* opinion which included an extensive discussion of the political question issue. Obviously, neither the parties nor the court below were unfamiliar with this issue and, in adopting Judge Renfrew's conclusions, the district court implicitly found the claim justiciable. Second, amicus's reliance on *Green v. Brown*, 398 F.2d 1006, 1009 (2d Cir. 1968), in which this court stated that "we would not ordinarily be receptive to attempts to litigate

## The Political Question Doctrine

■ The government contends that the court should not entertain Olegario's claim because it involves a nonjusticiable political question.[8] According to the government, to affirm the district court's decision in this case, "this Court must find that petitioner, if he had sued in 1945, could have persuaded a court of the United States to order the Vice Consul to remain in the Philippines despite the objections of the Philippine Government." Government's Brief at 20. Asserting that "the Constitution commits such foreign policy questions to the Executive branch," the government argues that the issues raised by this case are clearly nonreviewable. *Id..* The court, however, disagrees with this characterization. To resolve the political question issue posed by this case, we need not assume a historical perspective and determine whether Olegario's claim would have been either entertained or granted in 1945 when the allegedly unconstitutional action occurred. Instead, as the government apparently recognizes, the court must examine the issues currently raised by the case in light of the political question criteria delineated by the Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961). On the basis of this examination, the court concludes that Olegario's claim is justiciable.

■ Writing for the *Baker* Court, Justice Brennan described the fundamental attributes of the political question doctrine.

issues not raised in the trial court," is misplaced. The *Green* court acknowledged that this is not an absolute rule, a point recently reiterated in *Adato v. Kagan*, 599 F.2d 1111, 1116 (2d Cir. 1979). Indeed, in *Green*, the SEC, which had entered the case as amicus on appeal, was permitted to present a new legal theory to the appellate court. Like *Green*, this case involves an important federal issue and the government's case below was argued by the naturalization examiner, not by the United States attorney currently representing the government. In short, the district court's implicit determination that Olegario's claim did not involve a nonjusticiable political question can be reviewed by this court on appeal.

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

*Id.* at 217, 82 S.Ct. at 710; *see Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Sneaker Circus Inc. v. Carter*, 566 F.2d 396 (2d Cir. 1977); *Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Orlando v. Laird*, 443 F.2d 1039 (2d Cir.), *cert. denied*, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971).

None of the "formulations" described above is "inextricable" from the case at hand. While the Constitution commits the responsibility for foreign affairs to the executive and legislative branches, see Art. I, § 8; Art. 2, § 2, this grant of authority is not dispositive. As stated in *Baker*, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." 369 U.S. at 211, 82 S.Ct. at 707. Furthermore, this case concerns naturalization, a matter involving both foreign and domestic affairs, and the power to establish policy in this area is expressly delegated to Congress. Art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization"). Indeed, one of the petitioner's principle contentions is that Congress's intent to grant citizenship to Filipinos like himself was thwarted by the actions of executive officers.

The precise "issue" in this case involves the due process constraints on the executive's authority. This question—in contrast to the wisdom of a foreign policy decision—is not textually committed exclusively to the political branches. Finally, it has been suggested that the "constitutional commitment" criteria should be deemphasized in foreign affairs cases because such cases are clearly not automatically immune from judicial review even though the Constitution vests foreign affairs authority in the political branches. *See 68 Veterans, supra*, 406 F.Supp. at 945–46; *Atlee v. Laird*, 347 F.Supp. 689, 703 (E.D.Pa.1972) (three judge court), *aff'd summarily*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). Adopting this view, we now turn to the remaining political question formulations described in *Baker*.

The government contends that there is a lack of "judicially discoverable and manageable standards" for deciding this case. According to the government, this case turns on whether the executive's withdrawal of naturalization authority from the Philippines contravened an act of Congress and occurred without congressional approval or authority. Relying on *Orlando v. Laird*, 443 F.2d 1039 (2d Cir.), *cert. denied*, 404 U.S.

869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971), the government argues that this inquiry into the "mutual participation," *id.* at 1042–43, between the executive and the legislature constitutes a nonjusticiable political question. *Orlando*, however, does not govern the case at bar.

The plaintiffs in *Orlando* charged that the Vietnam War was unconstitutional because Congress had not expressly declared war on that country. This court rejected the government's argument that the claim was not justiciable. Because "the constitutional delegation of the war-declaring power to the Congress maintains a discoverable and manageable standard imposing on the Congress a duty of mutual participation in the prosecution of war [, j]udicial scrutiny of that duty . . . is not foreclosed by the political doctrine." *Id.* at 1042. The court concluded, however, that the constitutional propriety of the means chosen by Congress to ratify the military action was a political question. This choice was "committed to the discretion" of Congress, and no "objectively manageable standards" existed by which to judge such action. *Id.* at 1043–44.

In contrast to *Orlando*, this action does not involve a constitutionally imposed duty of "mutual participation in the prosecution of war." *Id.* at 1042. Although the naturalization statute at issue here was enacted and implemented during World War II, it was not a military measure and did not directly concern the war effort. *Orlando*, unlike the instant action, arose at a time of intense national debate over the manner in which the war was being conducted. Given some evidence of congressional participation (*i. e.*, the Tonkin Gulf Resolution and appropriation statutes), the Court refused to prescribe the exact manner in which Congress had to signal its agreement or approval. Olegario is neither seeking such a directive nor asking the court to resolve a case for which no manageable standards exist. His claim that his due process rights were violated by the executive's allegedly unauthorized acts can be resolved according to established constitutional principles. *See 68 Veterans, supra*, 406 F.Supp. at 946.

This court can render a decision in this case without making an "initial policy determination of a kind clearly for nonjudicial discretion." *Baker v. Carr, supra*, 369 U.S. at 217, 82 S.Ct. at 710. The government does not contest this point. While the court is not equipped to judge the merits of naturalization laws or the wisdom with which they are implemented, it can determine whether the government's actions were arbitrary, unauthorized, and unconstitutional.

Resolution of this action would not reflect any greater "lack of respect due coordinate branches of government" than other judicial inquiries into the constitutionality of executive action. *See 68 Veterans, supra*, 406 F.Supp. at 947. The government contends that both political branches endorsed the action challenged here and cautions the court against unwarranted intervention in foreign affairs. But, as declared in *Baker*, foreign affairs cases, which often involve joint legislative and executive action, are not automatically immune from judicial review. Furthermore, the petitioner argues that the executive's actions contravened Congress's intent, and the question of congressional approval is a hotly debated issue in this case. Adjudication of Olegario's claim would not express undue disrespect towards the other branches of government.

This case does not present "an unusual need for unquestioning adherence to a political decision already made." *Id.* The government argues that "[t]he decision of the court below and in [*68 Veterans*] open a pandora's box of problems in administering the 1952 Act and in accommodating the large numbers of eligible veterans who may seek to qualify under the 1940 Act." Government's Brief at 29. The multifarious problems anticipated by the government include difficulties in proving eligibility, potential for fraud, administrative confusion, and the inherent hardships in assimilating the large numbers of veterans and their families who would likely come to the United States pursuant to the Act. While we are sympathetic to the government's

concerns, they do not render the case non-justiciable. First, the government has agreed to grant citizenship to the petitioners in *68 Veterans* and to others who filed their petitions before the appeal was withdrawn. Second, the parties appear to disagree as to the number of persons now likely to seek citizenship under the 1940 Act, and the court is uncertain about the actual impact of a decision affirming the order below. Finally, and most important, as stated by Judge Renfrew:

> Surely the Court should not conclude that there exists a need for unquestioning adherence to a prior political decision on the grounds that other Filipino ex-servicemen, including those presently in the Philippines, would logically be entitled to claim the benefits of a decision finding that these petitioners were denied their constitutional rights. The Government has alluded to thousands of Filipinos who would be so entitled, while petitioners maintain that the number is much smaller. The actual number is irrelevant, for no decision delineating fundamental constitutional rights should turn on the number of persons who may be affected thereby. Moreover, no danger exists that American-Filipino relations would be harmed by a decision of the Court entitling some present residents of the Philippines to claim the right to naturalization pursuant to Section 702. As a sovereign independent state, the Philippine Islands is fully capable of instituting domestic policies in response to such a decision which would safeguard what it perceives to be its interests. Thus, for example, unlike 1945, the Philippine Government need not fear the loss of many of its citizens by emigration to the United States, for if it chose it could easily restrict or control their exit from the Philippines. The Court does not believe that the preservation of amicable relations between the United States and the Philippine Islands necessitates that it adhere unquestionably to the earlier executive decision.

*68 Veterans, supra*, 406 F.Supp. at 947 n.24.

Finally, the court concludes that resolution of this case would not create the "po-tentiality of embarrassment" from divergent governmental statements feared by the *Baker* Court. 369 U.S. at 217, 82 S.Ct. at 710. The government contends that "[t]he prospect that a court . . . could reverse a considered policy decision . . can be expected to chill future American initiatives in the international arena." Government's Brief at 31. This sweeping assertion, however, overstates the government's case. The executive action challenged here occurred almost thirty-five years ago and has not been the subject of extensive political debate. Neither the historical nor political events giving rise to this action reflect the usual state of foreign affairs and the case is easily confined to its facts. Attempting to magnify the impact of a decision in this area, the government argues that *68 Veterans* established that "an American court had the authority to order the naturalization of foreign nationals at the United States Embassy in their country despite the objections of the foreign government." *Id.* We disagree with this reading of the case and are confident that other nations will not be so misled.

Olegario's claim is thus not foreclosed by the political question doctrine under any of the standards described in *Baker v. Carr, supra.*

*Section 310(e)*

 Section 310(e) of the 1952 Act, 75 Stat. 656, 8 U.S.C. § 1421(e), was enacted in 1961 to countermand several decisions broadly construing the 1952 Act's savings clause as preserving rights established by the 1940 Act. See discussion *supra*. The section provides that any petition filed after September 26, 1961 will be governed by the 1952 Act requirements then in effect. The naturalization examiner who originally denied the petition in this case ruled that section 310(e) barred Olegario from relying on the 1940 Act's eligibility requirements. The government, relying on *United States v. Pasion*, 524 F.2d 249 (9th Cir. 1975), contends that a decision in Olegario's favor would lead to the "administration of two

nationality laws simultaneously," a result that Congress expressly sought to prevent by enacting the amendment. *See* [1961] U.S.Code Cong. & Admin.News, pp. 2981–82, quoted *supra*. *Pasion*, however, is distinguishable from the case at bar. And although the court recognizes Congress's intent to apply a uniform policy to all naturalization petitions, the statutory amendment cannot negate the due process rights of a petitioner who alleges that he was unconstitutionally denied the opportunity to apply for a benefit decreed by Congress.

The petitioner in *Pasion* was a Philippine citizen who had served in the United States armed forces from 1945 until 1949. More than thirty years later, he came to the United States and applied for citizenship. Pasion conceded that he had to satisfy the 1952 Act naturalization standards currently in effect, which required that he be admitted to the United States for permanent residence. Although Pasion did not have permanent resident status, he argued that his military service satisfied this requirement by virtue of section 2 of the 1940 Act, 54 Stat. 788, which provided in part that "service in the Regular Army honorably terminated shall be credited for purposes of legal residence under the naturalization laws." The Ninth Circuit Court of Appeals held that even assuming *arguendo* that section 2 applied to Filipinos after June 30, 1943 and that it was not repealed by implication by inconsistent provisions in later acts, section 310(e) required that all petitions meet the current standards. Pasion's "arguably implied status survive[d] only by operation of [the 1952 Act's savings clause]," and section 310(e) "foreclose[d] reliance on that implied status to meet the requirements of [the Act]." 524 F.2d at 251. The court stated that if Pasion's arguments were accepted, all noncitizens who served in the armed forces before 1952 would be entitled to naturalization solely on the basis of their military service because, under section 2, this service would satisfy the permanent residence requirement. *Id.* at 252. The petitioner in the instant action is not relying on an implied status arguably preserved by the 1952 Act's savings clause.

Olegario contends that his naturalization petition should be granted to remedy the due process violation allegedly committed by the government. The *Pasion* court did not consider the question whether section 310(e) should be applied to deny a constitutional remedy, and the Ninth Circuit's ruling is inapplicable to the case at bar. While Congress may repeal a statute, or amend it in response to judicial interpretations, such legislation does not automatically cut off the rights of those persons who were unconstitutionally deprived of statutory benefits to which they were previously entitled. Judge Knapp, reversing the naturalization examiner's decision in this case, stated that nothing in the legislative history of section 310(e) indicated that Congress was addressing the situation of those Filipino veterans such as the petitioner who had been unable to exercise their rights under the 1940 Act in 1946. Similarly, in *Petition of Neria, supra,* slip op. at 16–18, 27, section 310(e) did not prevent the court from granting citizenship to a petitioner who alleged that the government's failure to advise him of his naturalization rights under the 1940 Act denied him due process of law.

In *Hibi, supra,* the Supreme Court rejected the petitioner's claim that the government should be estopped from relying on the 1940 Act's expiration date because it had failed to publicize the naturalization opportunities available under the Act and had failed to assign an INS representative to the Philippines during the entire time the Act was in effect. As noted above, the Court held that such action, or inaction, did not constitute the kind of "affirmative misconduct" that could give rise to an estoppel against the government. The Court did not, however, rule that Hibi was barred from asserting a claim under the 1940 Act by the section 310(e) requirement that all petitions be judged by the stricter 1952 Act standards now in effect. Nor will this court apply that provision to bar Olegario from challenging the constitutionality of executive action that allegedly denied him the opportunity to apply for a benefit granted by Congress. Of course, as in *Hibi,*

the merits of the petitioner's claim raise very different concerns than his right to pursue the action.

*The Hibi Decision and Laches*

The government contends that the district court erred in granting Olegario's naturalization petition because such equitable relief is foreclosed by the Supreme Court's decision in *Hibi.* In the government's view, since the petitioner concedes he is not eligible under the 1952 Act requirements, the only available remedy is to estop the government from relying on the requirements now in effect. Such estoppel, according to the government, would not reflect the merits of Olegario's claim or the manner in which it was presented, but would presume some type of governmental misconduct that justifies barring the government from refusing to grant Olegario the citizenship for which he is otherwise ineligible. The government argues that *Hibi* clearly precludes this result because the Court there ruled that the executive action challenged did not give rise to an estoppel against the government. The government's argument, however, relies on an overly broad reading of the *Hibi* decision which we reject.

*Hibi* was a split decision that summarily reversed the Ninth Circuit in a per curiam opinion rendered on the basis of a petition for certiorari without full briefs and oral argument. The Supreme Court issued a narrow ruling based solely on estoppel and "affirmative misconduct"; the constitutional issue raised here was neither presented nor considered in that case. While Hibi argued that the doctrine of equitable estoppel *should bar the government from* denying his petition, Olegario contends that naturalization is the appropriate remedy if a constitutional violation is established. The Supreme Court's decision rejecting Hibi's legal theory and denying him relief on those grounds does not foreclose this court's consideration of Olegario's quite distinct due process claim. *See 68 Veterans, supra,* 406 F.Supp. at 942–43. The constitutional issue remains unresolved and, if a violation is found, this court is free to order the appro-

priate relief. *See Swann v. Board of Education,* 402 U.S. 1, 12, 91 S.Ct. 1267, 1274, 28 L.Ed.2d 554 (1970) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent equitable remedies."); *United States v. Vincent,* 524 F.2d 153, 160–61 (2d Cir. 1975) (accord).

The government also argues that the relief sought by Olegario is barred by the equitable doctrine of laches. To invoke the doctrine successfully, the government must establish that its interests were prejudiced by Olegario's lack of diligence in pursuing this claim. *Emle Industries, Inc. v. Glen Raven Mills, Inc.,* 478 F.2d 562, 574 (2d Cir. 1973); *Trafalgar Shipping Co. v. International Milling Co.,* 401 F.2d 568, 571 (2d Cir. 1968). The government purports to find support for its laches defense in the Supreme Court's *Hibi* decision. The Court there stated that "[Hibi's] effort to claim naturalization under a statute which by its terms had expired more than 20 years before he filed his lawsuit must therefore fail." 414 U.S. at 9, 94 S.Ct. at 22. According to the government, "[a]lthough the Court did not use the word laches, that principle obviously was what the Court had in mind." Government's Brief at 43. This court, however, is less confident about its mind-reading ability, and the government's hypothesis appears unfounded. The sentence quoted above, which was the final statement preceding the Court's order, merely reiterated the Court's conclusions and the result in the case. After finding that the government's alleged misconduct did not constitute grounds for estoppel, it is highly unlikely that the Court would then rule that Hibi's claim was barred by laches. If the Court had so ruled, the doctrine would probably have been expressly applied as an alternative ground for the decision. Nothing in the Supreme Court's or Ninth Circuit's opinion in the case suggests that laches was asserted or considered as a defense to Hibi's suit.

The government has not established that the petitioner has "slept upon his rights."

*Wagner v. Baird*, 48 U.S. (7 How.) 234, 258, 12 L.Ed. 681 (1849). The government contends that for over thirty years Olegario made no effort to enforce his claim, although he was apprised of his rights under the 1940 Act and that "he surreptitiously entered this country and then sought naturalization only after his authorized stay expired." Government's Brief at 44. Olegario, not surprisingly, vigorously disputes the government's description of his activities in the United States. See Petitioner's Brief at 3–4. Even adopting the government's view of the facts, Olegario does not seem to have unreasonably delayed pursuit of his claim. Olegario testified that he did not apply for citizenship while he was in the Philippines because he had learned from several different friends, who were identified at trial, that no INS representative was stationed at the Consulate to process applications. Tr. at 3–6. His failure to act at that time appears reasonable in light of the information he received and the poor condition of the communication and transportation systems then in operation. *Id.* at 7. Practically, Olegario could not have brought the instant action until he came to the United States in 1977, and he initiated naturalization proceedings less than one year later. See Joint Appendix, A–1 (Application to File Petition for Naturalization, dated April 20, 1978). Laches demands more than just delay; it requires lack of diligence. *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975); *American Marine Corp. v. Citizens Cas. Co.*, 447 F.2d 1328 (5th Cir. 1971). While pursuit of this claim has certainly been delayed, Olegario's conduct, or failure to act, does not constitute unreasonable procrastination.

The government argues that it was prejudiced by the petitioner's delay in asserting his claim because "[a]gainst the explicit intentions of Congress, it is forced to administer two naturalization laws simultaneously and to defend against recent claims relating to occurrences over thirty years ago." Government's Brief at 44. Yet the government has already agreed to the simultaneous administration of two naturalization laws pursuant to its policy of not opposing Category I petitions relying on the 1940 Act and Category II cases filed before November 30, 1977. The INS, therefore, will be reviewing petitions and making recommendations in cases just like the one at bar. While the government is rightfully concerned about fraudulent claims, it need not grant citizenship to any alien who cannot establish his eligibility. The court in *68 Veterans*, for example, held that Category III petitioners, who failed to provide adequate proof of military service, would be denied relief unless the necessary proof were supplied to the INS within ninety days. In this case, the government concedes that the petitioner satisfies the eligibility requirements of the 1940 Act, and the only disputed factual issue—the date that Olegario was discharged from the army—was resolved in the government's favor by the district court. The government's decision to process and grant other 1940 Act petitions indicates that the proceedings could go forward without undue hardship. In short, the government has failed to establish that it will be unfairly prejudiced by Olegario's delay in instituting this action.

Neither the Supreme Court's *Hibi* decision nor the equitable doctrine of laches bars Olegario from pursuing this claim.

*Olegario's Constitutional Claim*

■ We agree with Judge Renfrew's conclusion in *68 Veterans* that Filipinos like the petitioner were United States nationals protected by the Constitution until the Philippines became an independent country on July 4, 1946. *See Johnson v. Eisentrager*, 339 U.S. 763, 771, 780, 70 S.Ct. 936, 940–944, 94 L.Ed. 1255 (1950); *Balzac v. Porto Rico*, 258 U.S. 298, 312–13, 42 S.Ct. 343, 348, 66 L.Ed. 622 (1922); *Dorr v. United States*, 195 U.S. 138, 146–47, 24 S.Ct. 808, 811–812, 49 L.Ed. 128 (1904); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). The government does not contest this point. All the parties thus agree that Olegario can assert a claim based on the Due Process Clause of the Fifth Amendment and the Equal Protection rights derived from that provision. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903,

48 L.Ed.2d 495 (1976); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). The litigants part company, however, when it comes to defining the constitutional interest at stake and selecting the proper standard to apply in evaluating the executive action challenged here. The parties also disagree over whether the withdrawal of the naturalization examiner from the Philippines contravened a statutory mandate and frustrated Congress's intent in enacting sections 701–705 of the 1940 Act.

The Fifth Amendment prohibits the government from depriving an individual of "life, liberty, or property, without due process of law." U.S.Const. amend. V. To invoke the procedural protections of the Constitution, a litigant must establish that the individual interest asserted is encompassed within the right to "life, liberty, or property" protected by the amendment. *See Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 569–72, 92 S.Ct. 2701, 2705–2706, 33 L.Ed.2d 548 (1972). Olegario alleges that he was "arbitrarily precluded from exercising a 'liberty' right, created by a congressional act, to apply for naturalization." Petitioner's Brief at 26. According to the petitioner, "[s]ince this right was created by virtue of legislation, it was neither inchoate, contingent, or a mere expectancy, but rather a vested one in which petitioner '[had] a legitimate claim to entitlement.'" *Id., quoting Board of Regents v. Roth, supra,* 408 U.S. at 564, 92 S.Ct. at 2701.

Naturalization proceedings began in the Philippines in August 1945 and were terminated on October 26, 1945. Olegario remained eligible for naturalization under section 702 until December 2, 1945 when he was discharged from the army. He argues that any deprivation of the opportunity to apply for naturalization—no matter how brief—is constitutionally significant. As amicus points out, Filipino servicemen could not have known about the naturalization law prior to the liberation of the Philippines and they never received any official notification afterwards. *See Petition of Neria,*

*supra.* Naturalizations began as the war was drawing to a close and many Filipinos were soon discharged from the army and ineligible for citizenship. The Association asserts that "the halting of naturalization . . . had the effect of preventing news of the law from reaching qualified veterans in the only way it could—by word of mouth." Amicus Brief at 40. The petitioner and amicus thus argue that because the government's alleged misconduct significantly affected Olegario's legal rights, he is entitled to relief without proving that word would have reached him or that he would definitely have been naturalized if the Vice Consul's authority had not been revoked.

The court agrees that this case does not turn on whether Olegario can prove that he would have been naturalized but for the Attorney General's decision to withdraw the naturalization examiner from the Philippines. This inquiry addresses Olegario's standing to bring this action which is neither challenged by the government, see Government's Brief at 16, nor questioned by the court. The petitioner has demonstrated "an injury to himself that is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976), and has shown a "'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), *quoting Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).

Contrary to Olegario's assertions, however, a constitutionally protected "legitimate claim [of] entitlement" to American citizenship was not at stake in this case. The 1940 Act did not grant Filipinos such as the petitioner a vested right to citizenship; it liberalized the requirements and established a mechanism, to be implemented by the Commissioner and the Attorney General, to enable soldiers overseas to apply for naturalization. *See Greenholtz v. Inmates of Nebraska Penal & Correctional Facility,*

442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Arnett v. Kennedy*, 416 U.S. 134, 153–55, 94 S.Ct. 1633, 1643–1644, 40 L.Ed.2d 15 (1974) (plurality opinion). At most, the statute provided Olegario with an opportunity to become a citizen. Accordingly, this is not a case in which the traditional procedural due process analysis regarding entitlement, deprivation, and procedural requirements is appropriate. The petitioner is not claiming that he was wrongfully deprived of a benefit as a result of inadequate factfinding or improperly applied standards. Rather, his complaint is that the Commissioner and the Attorney General exceeded their authority in violation of a legislative enactment, therefore depriving him of that opportunity. We will thus consider this aspect of his claim simply as a statutory interpretation question inquiring whether the executive's actions clearly contravened a congressional mandate.[9] Petitioner's equal protection claim charging that these actions unjustifiably discriminated against a protected class does, of course, raise a constitutional issue, *see Hampton v. Mow Sun Wong, supra*, 426 U.S. at 102–03, 96 S.Ct. at 1904–1905; it will be analyzed as such under the appropriate standards. We first turn to the statutory issue.

1. *Executive Authority and Congressional Intent*

▮▮▮▮ Absent a congressional grant of statutory authority, the authority of the executive branch is limited to the express and implied powers of Article II of the Constitution, insofar as those powers are not inconsistent with Congress's legislative authority as defined in Article I. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38, 72 S.Ct. 863, 870–871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring); *In re Grand Jury Investigation of Ven-Fuel*, 441 F.Supp. 1299, 1306 (M.D.Fla.1977). The Constitution thus provides a rough guide to the proper allocation of authority between the political branches, *see Kennedy v. Sampson*, 511 F.2d 430, 434 (D.C. Cir. 1974), and the executive cannot act as a lawmaker without a delegation of authority or mandate from Congress. *See Commissioner v. Acker*, 361 U.S. 87, 92, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959); *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 235 (8th Cir. 1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). The Constitution's grant of executive authority does not include the right to nullify legislative acts or ignore statutory directives. *See Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411–13, 91 S.Ct. 814, 821–822, 28 L.Ed.2d 136 (1970); *Zieske v. Butz*, 412 F.Supp. 1403, 1406 (D.Alaska 1976); *Sioux Valley Empire Elec. Ass'n, Inc. v. Butz*, 367 F.Supp. 686, 698 (D.S.D. 1973), *aff'd*, 504 F.2d 168 (8th Cir. 1974); *Catano v. Local Bd. No. 94 Selective Serv. Sys.*, 298 F.Supp. 1183, 1188 (E.D.Pa.1969).

---

**9.** Although the petitioner and the government discussed this issue in due process terms, we will consider their arguments in the context of our statutory analysis. The court assumes, without deciding, that the petitioner can assert this statutory claim pursuant to principles of judicial review that were subsequently codified in the Administrative Procedure Act after the action challenged here occurred. Nothing in the 1940 Act, its legislative history, or related subsequent provisions expressly or implicitly precludes judicial review. Accordingly, the court will apply the well established presumption favoring the reviewability of administrative action. *See Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The petitioner may also have a cause of action in equity for "[i]f the [Administrative Procedure] Act should be given narrow reading, the action [challenging agency conduct] is sustainable by reference to the general equity jurisdiction of the District Court." *Independent Broker-Dealers' Trade Assoc. v. SEC*, 442 F.2d 132, 143 n.18 (D.C. Cir. 1971). In *Independent Broker-Dealers'*, the court of appeals stated that an action under the APA is "probably coterminous with [the] equity doctrine" established in such cases as *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). 442 F.2d at 143 & n.18. The *Leedom* Court held that a cause of action distinct from statutory review provisions may be available to challenge an administrative action that allegedly exceeds the agency's delegated powers and contravenes a statutory mandate. 358 U.S. at 188–91, 79 S.Ct. at 183–185. The petitioner's allegations fall within this category of claims.

Section 702 of the 1940 Act provided in part:

> During the present war, any person entitled to naturalization under section 701 of this Act, who while serving honorably in the military or naval forces of the United States is not within the jurisdiction of any court authorized to naturalize aliens, may be naturalized in accordance with all the applicable provisions of section 701 without appearing before a naturalization court. The petition under this section shall be made and sworn to before, and filed with, a representative of the Immigration and Naturalization Service designated by the Commissioner or a Deputy Commissioner, which designated representative is hereby authorized to receive such petition in behalf of the Service, . . . and to grant naturalization, and to issue certificates of citizenship: . . . .

Section 705 provided:

> The Commissioner, with the approval of the Attorney General, shall prescribe and furnish such forms, and shall make such rules and regulations, as may be necessary to carry into effect the provisions of this Act.

The petitioner contends that the Commissioner and the Attorney General were clearly charged with a duty to implement the statute but failed to execute this mandate and acted in a manner contrary to an explicit congressional act. Congress was not informed that the INS representative had been withdrawn from the Philippines and few, if any, members were aware of this development. The Commissioner's action was never expressly ratified by Congress. The Association asserts that other legislation enacted at this time evidences Congress's firm intent to provide generous naturalization opportunities for Filipino servicemen. For example, amicus states that at the end of 1945, Congress passed a statute extending the deadline for filing petitions under section 702 until December 31, 1946. Act of December 28, 1945, Pub.L. No. 79–270, § 202(c)(1), 59 Stat. 658. And, according to the Association, Congress did not share the Attorney General's concern about depriving the Philippines of manpower. Shortly after the INS representative was called back, a law was enacted that authorized the recruitment of 50,000 Filipinos to serve with American occupation forces in the Far East after the war. Armed Forces Voluntary Recruitment Act of 1945, Pub.L. No. 79–190, § 14, 59 Stat. 543. In the view of the petitioner and amicus in this case, "there is scant evidence, if any, of the 'mutual participation' by Congress in the halting of naturalizations in the Philipines . . . [and] the issue remains . . . whether the decision to stop naturalizing qualified veterans there thwarted the will of Congress as expressed in [sections] 701–705." Amicus Brief at 23–24.

The government paints a very different picture of the political climate in which this decision was made. It contends that the manner in which the Act was implemented was left to the executive's discretion pursuant to section 705. The Commissioner's responsibility to enforce the Act could only extend to situations where implementation was feasible. According to the government, "given the real opposition [by the Philippine government] to naturalization in the Philippines, these executive actions may have been the only means by which the 1940 Act could have been implemented . . . ., and thus may well have facilitated the naturalization examiner's return in 1946." Government's Brief at 41. The government also asserts that there was some cooperation in this area between the executive and legislative branches. Not only did the Commissioner assign a new naturalization examiner to the Philippines nine months later, but Congress never acted to reverse or compensate for the Commissioner's decision and refused to extend the section 702 filing deadline beyond the December 31, 1946 expiration date. *See 68 Veterans, supra,* 406 F.Supp. at 946 n.23. In addition, the government points to what it disingenuously describes as "documents showing the involvement of the Senate Committee on Territories and Insular Affairs" to demonstrate that Congress con-

curred in the executive decision. Government's Brief at 26.[10]

Finally, the government argues that even if the withdrawal of the naturalization examiner frustrated the provisions of the 1940 Act, the action was neither unreasonable nor unconstitutional. According to the government, the executive has discretion to suspend implementation of congressional acts where continued enforcement would be contrary to Congress's intent in adopting such programs. Although Congress may have sought to extend naturalization opportunities to Filipinos, "it clearly could not have intended to do so over the objections of the Philippine Government." *Id.* at 42.

Undoubtedly, it is difficult to ascertain with certainty the degree to which the legislature and the executive worked in tandem, or at cross-purposes, regarding the naturalization of Filipino servicemen. The decision challenged here was made over thirty years ago on the basis of internal government memoranda that described a sensitive political development without providing a detailed discussion of the issue. Subsequent legislative enactments do not provide an unequivocal statement of congressional intent. Recognizing these difficulties, we conclude that neither the petitioner's nor the government's view accurately depicts the situation; the truth, as usual, appears to lie somewhere in between. We also conclude with the withdrawal of the naturalization examiner from the Philippines did not constitute an unconstitutional exercise of executive authority.

▆▆▆ The executive branch did not have unbridled discretion in implementing the 1940 Act, and the unilateral withdrawal of the naturalization examiner temporarily frustrated Congress's immediate objective in enacting the statute. Yet the authority

granted to the Commissioner to effectuate the Act, *with the approval of the Attorney General*, see section 705, necessarily included the right to exercise some discretion in enforcing its provisions. For example, no mandatory procedures, schedules, or timetables were prescribed by the Act for assigning INS representatives to overseas locations. The Commissioner was thus free to rotate naturalization examiners from post to post through England, Iceland, North Africa, and the Pacific Islands without making any permanent assignments in these areas. *See 68 Veterans, supra,* 406 F.Supp. at 935. Not surprisingly, the Act does not address the right of the Commissioner or the Attorney General, in implementing the statute, to respond to political developments in our relations with other governments. Congress's silence, however, "on a subject about which no one had suggested a need to speak should not be interpreted as reflecting an intent either to grant or to deprive" the executive branch of the authority to consider the foreign affairs ramifications of a particular mode of enforcement and to suspend implementation to avoid a confrontation. *See United States v. Conroy,* 589 F.2d 1258, 1266 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979).

▆▆▆ In the absence of a statutory mandate or express prohibition, such authority or the implicit intent to grant it may be found in the inherent and well recognized powers of the executive branch. *See Youngstown Sheet & Tube Co. v. Sawyer, supra,* 343 U.S. at 585–87, 637, 72 S.Ct. at 865–866, 871. While Congress is vested with authority over naturalization, the executive's wide discretion in foreign affairs, *see Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103,

---

10. Apparently, the government is referring to an October 19, 1945 Memorandum to the Commissioner written by Edward Shaughnessy, his Special Assistant. This Memorandum stated that Senator Hayden, a member of the Committee on Territories and Insular Affairs, was concerned that the numerous Filipinos deemed to be members of the United States armed forces and eligible for naturalization under section 702 would be entitled to government pensions and benefits that the government could not afford. While Senator Hayden may have been informed at that time that the Vice Consul's naturalization authority was revoked, the Memorandum does not indicate that he or his Committee participated in that decision, which had been made several weeks earlier.

109–11, 68 S.Ct. 431, 435–436, 92 L.Ed. 568 (1948); *United States v. Curtis-Wright Export Corp.*, 299 U.S. 304, 318–22, 57 S.Ct. 216, 220–221, 81 L.Ed. 255 (1936); *Sardino v. Federal Reserve Bank*, 361 F.2d 106 (2d Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966), may affect national policy toward noncitizens. *See Hampton v. Mow Sun Wong, supra*, 426 U.S. at 105, 114, 116, 96 S.Ct. at 1906, 1910, 1911; *Kliendienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972). The executive decision at issue here was thus based on policy considerations traditionally, although not exclusively, associated with the executive branch. The authority granted to the Commissioner and the Attorney General, to implement the Act without specific guidelines or restrictions, was sufficient to permit the executive to exercise some discretion when confronted with a seemingly delicate foreign affairs matter. In the words of the Supreme Court, "because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281 (1965). The decision to withdraw the naturalization examiner from the Philippines was not clearly beyond the limits of the Attorney General's discretion or contrary to Congress's vision of the executive's role in implementing the Act.

Although Congress was neither informed of nor ratified the Attorney General's revocation of the Vice Consul's naturalization authority, the decision does not appear to be patently contrary to Congress's intent when viewed in light of subsequent legislative actions. As noted above, the Association points out that two weeks after the decision was made Congress passed a law authorizing the recruitment of 50,000 Filipinos to serve with American armed forces occupying Japan. This provision was added as a minor amendment, proposed by Senator Hayden, to a comprehensive bill designed to stimulate voluntary enlistments in the armed forces. See 91 Cong.Rec. 9016, 9456 (1945). The recruitment of Filipinos was expressly contingent upon "the approval of the Philippine Government." 59 Stat. 543. As explained by the amendment's sponsor on the Senate floor, "the Philippine Government shall be consulted before any final action under the amendment is taken, because we know that the independence of the Philippine Islands is to take place next year." 91 Cong.Rec. 9016 (1945). The original amendment that was introduced required the approval of the Philippine legislature. It was changed "in conference . . . to provide that instead of being approved by the Philippine Legislature it should be approved by the Philippine Government, so as to eliminate any possible chance for controversy between the legislature of the Philippines and the executive department, President Osmena." *Id.* at 9456 (Remarks of Rep. May on the Conference Report of H.R. 3951).

The legislative history of this provision flatly refutes any suggestion that it reflects congressional intent to widen naturalization opportunities for Filipinos. In response to questions from his fellow Senators regarding the naturalization of Filipinos recruited into the military pursuant to this provision, Senator Hayden stated:

They will not acquire a wholly different citizenship. Each scout will remain a citizen of the Philippine Islands. . . . If foreigners are recruited for service in the American Army in time of war, after they enlist they are entitled to become naturalized citizens of the United States, but that is not true in this instance. The amendment provides that only citizens of the Philippine Islands may enlist in the Philippine Scouts. They must be citizens of the Philippine Islands in order to get into this service, and when they return to their homes they will still be citizens of the Philippine Islands.

*Id.* at 9016–17. The Senator's remarks provoked no disagreement or dissent from the

legislators who subsequently approved the amendment. *Id.* at 9017.

In December 1945, Congress did pass a law providing that petitions could be filed under section 702 until December 31, 1946. Amicus contends that this legislation illustrates Congress's intent to enhance the naturalization opportunities for Filipinos. However, no such intent is evidenced by the Act's legislative history. The Act included a provision stating that no person would be naturalized under section 702 unless that individual had served in the United States armed forces prior to the date the law was enacted. The Senate discussion of the bill focused on the need to prevent previously non-enlisted aliens, who subsequently enlist in the armed forces, from taking advantage of the 1940 Act's liberal naturalization standards. See 91 Cong.Rec. 12324–25 (1945). As succinctly stated by Senator Russell, the Chairman of the Committee on Immigration, "[t]he purpose of the amendment is to terminate the power to grant citizenship, and not to extend it." *Id.* at 12325.[11] During the course of the discussion, the Senator was asked whether his committee had ever considered permitting a soldier in the United States Army to be naturalized if he had never been lawfully admitted to this country. *Id.* (Remarks of Senator Saltonstall). Senator Russell answered that citizenship would not be granted under those circumstances and that the amendment under consideration would not affect such a case. He then stated:

> We did have a special law in the case of natives of the Philippines who went into the armed forces of the Philippines National Army. They were allowed citizenship in the United States, but that privilege has since been terminated by law.

*Id.* It is unclear what law the Senator is describing. He may have been referring to an entirely different provision or it is possible that he misunderstood or mischaracter-

ized the present state of affairs. The 1940 Act required that the applicant had been lawfully admitted to the United States, its territories or possessions and had served in the United States armed forces. Under the INS rulings in effect at the time, the Philippines were included in that geographical area, and service in the Commonwealth Army or Philippine Scouts were deemed to satisfy the military service requirement. See Cox Memorandum, *supra*; Winings Memorandum, *supra*. The court does not read Senator's Russell's remarks as indicating that he was aware of or approved the decision to withdraw the naturalization examiner from the Philippines. It is significant, however, that in December 1945 the Chairman of the Senate Committee on Immigration apparently acknowledged that Filipino servicemen could not apply for citizenship without coming to the United States. This statement was not questioned, and no disapproval of the law as described was expressed.

In sum, we conclude that the executive's authority to implement the 1940 Act included the right to exercise discretion in the face of a potential diplomatic conflict. The decision to withdraw all naturalization authority from the Philippine Islands for a nine month period was not a manifest abuse of that discretion. Nor do Congress's subsequent legislative actions illustrate an intent clearly inconsistent with that decision.

### 2. *Equal Protection*

Olegario argues that the executive action challenged here should be subject to strict judicial scrutiny because it: (1) constituted adverse and unequal treatment of a suspect class; (2) deprived the petitioner of his right to American citizenship; and (3) was performed by the Attorney General and the Commissioner, whose authority to act for the President in foreign affairs is questionable. Alternatively, he suggests that the

---

**11.** It is unclear whether this bill actually served to extend the time in which petitions could be filed under section 702. In August 1945, four months before this legislation was enacted, the Commissioner stated in a memorandum to the Attorney General that "the benefits of Section 702 may be available to members of the armed forces until December 31, 1945." Memorandum to Tom C. Clark, Attorney General, from Ugo Carusi, Commissioner, dated August 23, 1945.

"rational relationship test" be applied; the government must demonstrate that the classification of persons denied the opportunity to take advantage of the 1940 Act was rationally related to a legitimate government interest. *See United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1972). Olegario asserts that the executive's conduct cannot satisfy either standard. The government, as expected, argues that the action passes muster under either test but that strict scrutiny is inappropriate here. Both parties rely on the Supreme Court's opinion in *Hampton v. Mow Sun Wong, supra*, to support their positions.

In *Mow Sun Wong*, five aliens who were lawful permanent residents of the United States challenged a Civil Service Commission (CSC) regulation that excluded all noncitizens from eligibility for a federal civil service position. The district court for the Northern District of California rejected the plaintiffs' claim that the regulation violated the equal protection guarantees inherent in the Due Process Clause of the Fifth Amendment. 333 F.Supp. 527, 531–33 (N.D.Cal.1971). The Ninth Circuit reversed. While recognizing that the Fifth Amendment's protection against federal discrimination is not coextensive with the Fourteenth Amendment's prohibitions against the states, the court of appeals held that the justifications proffered by the government could not support a sweeping regulation excluding all aliens from all positions requiring the Civil Service examination. 500 F.2d 1031, 1037 (9th Cir. 1974). The Supreme Court affirmed the Ninth Circuit decision invalidating the regulation, but on quite different grounds. "[A]ssuming without deciding that the national interests identified by the petitioners would adequately support an explicit determination by Congress or the President to exclude all noncitizens from the federal service," the Court concluded that "those interests cannot provide an acceptable rationalization for such a determination by the Civil Service Commission." 426 U.S. at 116, 96 S.Ct. at 1911.

The Court's decision reaffirmed the principle that "overriding national interests" may justify seemingly discriminatory rules and regulations that would be impermissible if adopted by a state. "[T]he paramount federal power over immigration and naturalization" thus foreclosed a simple extension of the Court's Fourteenth Amendment decisions as decisive in this case. *Id.* at 100, 96 S.Ct. at 1904, *citing Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), and *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

When the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest. If the agency which promulgates the rule has direct responsibility for fostering or protecting that interest, it may reasonably be presumed that the asserted interest was the actual predicate for the rule. That presumption would, of course, be fortified by an appropriate statement of reasons identifying the relevant interest. Alternatively, if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption.
426 U.S. at 103, 96 S.Ct. at 1905.

The Court found that the regulation was neither mandated nor approved by Congress or the President. While the CSC has discretionary authority to adopt regulations that will promote efficiency, it cannot rely on considerations that are not "properly the business of the Commission." *Id.* at 115, 96 S.Ct. at 1911. With one exception, the interests put forth to justify the regulation involved foreign affairs, immigration, and naturalization—areas in which the CSC has no expertise or responsibility. The Court thus concluded that the CSC regulation barring resident aliens from the federal civil service could not survive judicial scrutiny. "Since these residents were admitted as a

result of decisions made by the Congress and the President, *implemented by the Immigration and Naturalization Service acting under the Attorney General of the United States*, due process requires that the decision to impose the deprivation of an important liberty be made either at a *comparable level of government* or, if it is to be permitted to be made by the Civil Service Commission, that it be justified by reasons which are properly the concern of that agency." *Id.* at 116, 96 S.Ct. at 1911. (footnote omitted) (emphasis added).

The executive branch quickly responded to the Supreme Court's suggestion. Three months after *Mow Sun Wong* was decided, President Ford issued an Executive Order providing for the exclusion of aliens from the federal civil service. Exec. Order No. 11935, 5 C.F.R. § 7.4 (1976), amending Civil Service Rule VII. That order has survived several court challenges. *See, e. g., Jailil v. Campbell*, 590 F.2d 1120 (D.C. Cir. 1978); *Vergara v. Hampton*, 581 F.2d 1281 (7th Cir. 1978), *cert. denied*, 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979); *Mow Sun Wong v. Hampton*, 435 F.Supp. 37 (N.D.Cal. 1977); *Santin Ramos v. CSC*, 430 F.Supp. 422 (D.P.R.1977). Relying on the Supreme Court's *Mow Sun Wong* decision, these courts have ruled that the Order was within the statutory grant of executive authority to "prescribe such regulations . . . as will best promote the efficiency of the [CSC]," 5 U.S.C. § 3301, and was supported by national interests sufficient to satisfy the appropriate constitutional standard. As stated by Chief Judge Peckham, "when the federal government seeks to sustain a rule discriminating against noncitizens in a manner which would violate equal protection if adopted by a state, it must demonstrate that the rule substantially furthers important federal interests in the regulation of immigration and naturalization." 435 F.Supp. at 44.

■ *Mow Sun Wong* and other Supreme Court decisions, *e. g., Nyquist v. Mauclet*, 432 U.S. 1, 7 n.8, 97 S.Ct. 2120, 2124, 53 L.Ed.2d 63 (1977); *DeCana v. Bica*, 424 U.S. 351, 358 n.6, 96 S.Ct. 933, 937, 47 L.Ed.2d 43

(1976), firmly establish that "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens." *Mathews v. Diaz*, 426 U.S. 67 at 84, 96 S.Ct. 1883 at 1893, 48 L.Ed.2d 478. Moreover, "[t]he equal protection analysis . . . involves significantly different considerations [when] it concerns the relationship between aliens and the States rather than between aliens and the Federal Government." *Id.* at 84–85, 96 S.Ct. at 1894. This principle undermines in part the constitutional analysis in *68 Veterans*, which was adopted by the district court in this case. In *68 Veterans*, the court relied primarily on Fourteenth Amendment cases holding that alienage was a suspect classification that could be used only if necessary to accomplish a compelling state interest. *See* 406 F.Supp. at 950, *citing Graham v. Richardson, supra*, and *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). *But see* 406 F.Supp. at 948–49 (petitioner's legal theory, which relied on cases applying compelling state interest test to alienage classifications, does not "accurately fi[t] the facts of this case.") However, Supreme Court cases decided after *68 Veterans* clearly demonstrate that this heightened judicial scrutiny is not appropriate for federal policies and regulations, particularly in the areas of immigration and naturalization.

It is easier, of course, to state what the standard is not than to define precisely what it is. *See De Malherbe v. International Union of Elevator Constructors*, 438 F.Supp. 1121, 1135 (N.D.Cal.1977) (Renfrew, J.) ("The Supreme Court in *Mow Sun Wong* refused to decide what level of scrutiny federal discrimination against aliens should be subjected to . . . ."). Yet the Supreme Court's decisions do provide some guidance in determining what national interests are sufficiently weighty to support discriminatory treatment of aliens. In *Mow Sun Wong*, the Court suggested, without deciding, that if the regulation excluding noncitizens from the Civil Service were issued by the President or Congress, "it

would be justified by the national interest in providing an incentive for aliens to become naturalized or possibly even as providing the President with an expendable token for treaty negotiating purposes." 426 U.S. at 105, 96 S.Ct. at 1906. The Court also stated that "if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption." *Id.* at 103, 96 S.Ct. at 1905. The same day that *Mow Sun Wong* was decided, the Court issued an opinion upholding a federal regulation that denied certain Medicare benefits to aliens who had not been admitted for permanent residence in the United States and had not resided here for at least five years. *Mathews v. Diaz, supra.* The Court stated that "the real question" presented by the case was not whether discrimination between aliens and citizens is permissible, but "whether the statutory discrimination within the class of aliens—allowing benefits to some aliens but not to others—[was] permissible." 426 U.S. at 80, 96 S.Ct. at 1892. According to the Court, since Congress has no constitutional duty to provide all aliens with the benefits provided to citizens, "the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others." *Id.* at 82, 96 S.Ct. at 1892. Because that burden remained unsatisfied, and neither requirement was "wholly irrational," the Court sustained the exclusionary regulation. *Id.* at 83–87, 96 S.Ct. at 1893–1895.

Like *Diaz*, and in contrast to *Mow Sun Wong*, the government action challenged here did not discriminate between aliens and citizens. Yet the court rejects the government's assertion that because the withdrawal of the naturalization examiner was a foreign policy decision that "affected all foreign nationals in the Philippines" it had no "discriminatory purpose" and was "racially neutral." The Attorney General's decision had an intended adverse impact on Filipino servicemen even if it was not moti-

vated by racial animus. Having concluded that this action was neither unauthorized nor inconsistent with Congress's intent, the question before this court is whether the national interests at stake justified this decision.

The petitioner alleges that "[t]he national interest which the appellant has invoked to justify the arbitrary classification of Filipino war veterans is cloaked with speculation about the need to foster an ally in the Pacific after World War II and the pleas of some unidentified official of the new inchoate Phillipine government that too many Filipino males would be lost to American naturalization." Petitioner's Brief at 37. Petitioner points out that *no legislation, resolution, or executive proclamation* identified these concerns; they were stated only in internal government memoranda. Finally, Olegario contends that these documents show that the Commissioner was actually concerned about the expected influx of Filipino servicemen, but relied on diplomatic concerns to justify the revocation of naturalization authority.

The government memoranda submitted to the court do show that the impending naturalization of numerous servicemen raised concerns among federal officials apart from those voiced by the Philippine government. *See, e. g.,* Letter to Ugo Carusi, INS Commissioner, from R. B. Shipley, Passport Division Chief, dated April 17, 1946; Memorandum To T. B. Shoemaker from Edwin J. Shaughnessy, Special Assistant to the Commissioner, dated April 26, 1946 ("Shaughnessy Memorandum II"); Shaughnessy Memorandum I, *supra*; Letter to Ugo Carusi, INS Commissioner, from R. B. Shipley, Passport Division Chief, dated September 10, 1945. Undoubtedly, some officials and politicians were concerned about admitting many newly naturalized citizens into the country and feared the resulting drain on federal benefits. These concerns, however, which appear primarily in memoranda circulated after the Attorney General made the revocation decision, did not undermine his legitimate reliance on the objections expressed by the Philippine government.

It is indeed unfortunate that no official report or resolution provides a detailed description of the Philippine government's objections or the federal interest in attempting to assuage these concerns. As stated by the Commissioner's Special Assistant, the "occasional exchange of memoranda on this matter . . . has been most unsatisfactory from the beginning because apparently the most important data leading up to a decision to withdraw the designated examiner and to decline to designate other examiners was off the record." Shaughnessy Memorandum II, *supra*, at 1. Nevertheless, the memoranda submitted as evidence in this case refer repeatedly to the concerns expressed by the Philippine government. *See, e. g.*, Carusi Memorandum I, *supra*; Shaughnessy Memorandum I, *supra*; Shaughnessy Memorandum II, *supra*; Memorandum to L. Paul Winings, General Counsel, from Joseph Savoretti, Assistant Commissioner, dated May 21, 1945; Memorandum to Joseph Savoretti from L. Paul Winings, dated May 22, 1946. Furthermore, the Commissioner's memorandum to the Attorney General that recommended revoking the Vice Consul's naturalization authority discussed only the concerns expressed by the Philippine government—not the fears voiced by some federal officials—and indicated that the Philippine government had previously stated these concerns to the State Department and perhaps to the Attorney General's predecessor in office. See Carusi Memorandum, *supra*. "[T]he Constitution protects the alien from arbitrary action by our government but not from reasonable response to such action by his own." *Sardino v. Federal Reserve Bank, supra*, 361 F.2d at 111.

■ In foreign affairs touching on sensitive diplomatic matters, the government may explain or justify its conduct without presenting a complete exposition of the events and considerations giving rise to its actions. As stated by the Supreme Court:

It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. . . . They are delicate, complex, and involve large elements of prophecy.

*Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., supra*, 333 U.S. at 111, 68 S.Ct. at 436; *see Zemel v. Rusk, supra*, 381 U.S. at 17, 85 S.Ct. at 1281; *United States v. Curtis-Wright Export Corp., supra*, 299 U.S. at 319–21, 57 S.Ct. at 220–221; *Narenji v. Civiletti*, 617 F.2d 745 at 747 (D.C. Cir. 1979).

■ As indicated in the preceding discussion of *Mow Sun Wong* and *Diaz*, the Supreme Court is willing to presume the existence of a national interest sufficient to justify the unequal treatment of aliens or a particular class, even in the absence of an official government statement on the issue. In contrast to those cases, the decision challenged here was made by the Attorney General and the Commissioner, not the President or Congress. This distinction, however, does not render the principles enunciated in those decisions inapplicable to the case at hand. Indeed, in *Mow Sun Wong*, the Court expressly included the INS and the Attorney General in describing the appropriate "level of government" to make a decision depriving aliens of an important interest. The Commissioner and the Attorney General were statutorily authorized to implement the legislation involved in this case. While neither executive office specializes in foreign affairs, both are concerned with foreign policy and diplomatic matters touching on immigration and naturalization. *See Narenji v. Civiletti, supra*, at 747–748. In this capacity, each serves as the President's agent and is an integral member of the executive branch. *Cf. Hampton v. Mow Sun Wong, supra*, 426 U.S. at 114, 96 S.Ct. at 1910. (CSC "performs a limited and specific function"). Accordingly, the court concludes that the

decision made by the Commissioner and the Attorney General to revoke the Vice Consul's naturalization authority was justified in light of the express federal interest in responding to the concerns voiced by the Philippine government.

*Conclusion*

Upon concluding that the petitioner's claim is neither a nonjusticiable political question nor barred by *Hibi*, statutory, or equitable limitations, the court has reviewed the merits of Olegario's constitutional arguments. Olegario was entitled to claim the protections of the Due Process Clause at the time the naturalization examiner was withdrawn from the Philippines. In light of the statutory authority granted to the Commissioner and the Attorney General, and the existing state of foreign affairs, the executive's action must not have clearly contravened Congress's intent or mandate or have unconstitutionally discriminated against a particular class. The court holds that the withdrawal of the naturalization examiner was within the executive's traditionally broad discretion in foreign affairs and did not exceed the authority granted to the Commissioner and the Attorney General to implement the Act. While this action did have an adverse impact on Filipino servicemen, it was justified by a sufficiently important federal interest to satisfy the appropriate constitutional standard.

The decision of the district court is reversed.