Corliss **LAMONT**, et al., **Plaintiffs,**

v.

George P. **SCHULTZ**, et al., **Defendants.**

**No. 88 CIV 0684 (LBS).**

United States District Court, S.D. New York.

Oct. 2, 1990.

C. Edwin Baker, American Civil Liberties Union Found., New York City (John A. Powell, of counsel), Herman Schwartz, American University, Washington, D.C., for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, Bernard W. Bell, Asst. U.S. Atty., for defendants.

## OPINION

SAND, District Judge.

This is a federal taxpayers' suit in which plaintiffs challenge as a violation of the Establishment Clause of the First Amendment the appropriation and expenditure of public funds by the United States for the construction, maintenance and operation of religious schools abroad. Defendants claim that plaintiffs lack standing to bring this suit; that plaintiffs claims present non-justiciable political questions; and that the Establishment Clause does not apply to United States government funded programs overseas, or alternatively, if it applies, it does not bar the challenged grants. The case is before this Court on plaintiffs' motion for summary judgment and defendants' cross motion for summary judgment.

In February, 1988, plaintiffs brought an action for declaratory and injunctive relief on the above mentioned claim. Defendants made a motion to dismiss alleging plaintiffs lacked standing. On April 6, 1988, this Court issued a Memorandum Endorsement denying defendants' motion to dismiss, relying on *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) and *Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). In light of recent case law this Court has agreed to reconsider the standing issue. The standing question as well as two other novel issues discussed below are controlling issues of law which may terminate this litigation. For the reasons discussed below,

the Court will certify these questions to the Second Circuit before reaching a final judgment.

## I. *Background*

The American Schools and Hospitals Abroad Program ("ASHA") was established under the Foreign Assistance Act of 1961 ("Act"). 22 U.S.C. §§ 2151–2429a (1988). ASHA is one of a number of programs developed under the Act to assist developing countries acquire "the knowledge and resources essential to development and to build the economic, political, and social institutions which will improve the quality of their lives." 22 U.S.C. § 2151(a). Specifically, ASHA's purpose is to provide funding for schools outside the United States that are founded or sponsored by United States citizens and that serve as "study and demonstration centers for ideas and practices of the United States." 22 U.S.C. § 2174(a).

The program is administered by the Agency for International Development ("AID"), which awards grants to institutions or individuals in the United States that sponsor foreign schools. All of the grant funds are transferred by the United States sponsor directly to the overseas schools. Administration and financial accounting of the grant is the responsibility of the United States sponsor. Likewise, AID communicates any concerns and information regarding the grant to the United States sponsor and has virtually no contact with the foreign affiliate.

The ASHA office solicits and reviews grant applications before making recommendations to the Administrator of AID who is responsible for all final decisions. To assist in making grant decisions AID has published criteria for selecting grantees in the Federal Register. *See* 44 Fed. Reg. No. 228 (Nov. 26, 1979) (not codified in C.F.R.). Most of the criteria request general information about the foreign institution and its ability to promote United States values. Only one of the eleven criteria discusses religion. Criterion eight provides that "the [overseas institution] must be open to all persons regardless of race, religion, sex, color or national origin ... [and that] assistance may not be used to train persons for religious pursuits or to construct buildings or other facilities intended for worship or religious instruction." 44 Fed.Reg. No. 228 (Nov. 26, 1979). None of the ASHA criteria bar religiously-affiliated schools or require a determination of whether the institution is pervasively sectarian.

## II. *Threshold Issues*

Before this Court may apply any law relating to the application of the Establishment Clause a number of threshold issues must be resolved. The first question is whether the plaintiffs, as United States taxpayers, have standing to ask the Court to address the violations they allege. If plaintiffs succeed on the standing claim the next inquiry is whether the nature of the violation alleged is a political question beyond the competence of this Court. If there is no bar from the standing or political question doctrines, the Court must decide whether Establishment Clause principles and standards apply to overseas programs funded by the government that were founded by and continue to involve United States sectarian non-profit organizations.

### A. Standing

■ A resolution of the standing issue in this action is determined primarily by reference to three taxpayer cases, all involving Establishment Clause challenges. The holdings of these cases are built on more general standing concepts developed by the Supreme Court over the period of a decade beginning with *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In *Allen*, the Supreme Court made it clear that the doctrine of standing is rooted in Article III of the United States Constitution, which limits federal courts to adjudicating actual "cases and controversies." *Id.* at 750, 104 S.Ct. at 3324. If a plaintiff fails to establish that an action presents an actual case or controversy capable of judicial resolution, a court lacks subject matter jurisdiction. *See Valley Forge Christian College v. Americans United*, 454 U.S. 464, 483, 102 S.Ct. 752, 764, 70 L.Ed.2d 700

(1982). The general rule is that in order to have standing a plaintiff must allege a personal injury that is reasonably traceable to the defendants' alleged unlawful conduct and which is likely to be redressed by the relief requested. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324.

Standing requirements for federal taxpayer suits are quite specific. Since the days of *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Supreme Court has consistently held that federal taxpayers do not have standing to challenge how the federal government uses tax revenues. *See Ex parte Levitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). There is, however, a narrow exception. In *Flast,* the first of the three cases that are central to the standing issue in this action, the Court held that the *Frothingham* barrier should be lowered in one specific instance. 392 U.S. at 102–06, 88 S.Ct. at 1953–55. Standing should be present for taxpayer challenges to a federal statute on the ground that it violated the Establishment Clause of the First Amendment when the allegedly unconstitutional action was authorized by Congress under the Taxing and Spending Clause of Article I, § 8. *Id.*

In *Flast,* the Court outlined the standards plaintiffs must meet to satisfy the Article III case and controversy nexus requirements. First, the "[t]axpayer must establish a logical link between [taxpayers] status and the type of legislative enactment attacked." Second, the "[t]axpayer must establish a nexus between [taxpayer] status and the precise nature of the constitutional infringement alleged." 392 U.S. at 102, 88 S.Ct. at 1954. When both these requirements are met in an Establishment Clause violation claim, a federal taxpayer suit is properly before an Article III court.

Plaintiffs in the present case fit squarely within the *Flast* nexus requirements. First, they challenge expenditures made under a congressional appropriation pursuant to the Taxing and Spending Clause. Specifically, plaintiffs challenge expenditures under 22 U.S.C. § 2174(c). Plaintiffs meet the second test by challenging a congressional enactment that allegedly exceeds specific limits imposed on the Taxing and Spending Clause.

The Supreme Court affirmed *Flast* and expanded the analysis in *Kendrick,* 487 U.S. 589, 618, 108 S.Ct. 2562, 2579, 101 L.Ed.2d 520. The Court held that in Establishment Clause claims, taxpayer standing is available to challenge executive branch administration of a statute enacted pursuant to Taxing and Spending Clause authority. *Id.* at 618, 108 S.Ct. at 2579. In allowing a taxpayer standing to challenge a statute as applied as well as on its face, the Court stated "[it is no] less a challenge to Congress' taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the [executive branch]." *Id.* at 619, 108 S.Ct. at 2579. This is the second case of significance to this action since plaintiffs' challenge is based primarily on an "as applied" theory.

The third case that impacts significantly on plaintiffs' standing is *In re United States Catholic Conference,* 885 F.2d 1020 (2nd Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990). (*"USCC"*). In *USCC,* plaintiffs alleged that the Internal Revenue Service ("IRS"), the executive branch agency responsible for oversight under the Internal Revenue Code ("Code"), was not performing its job properly. *Id.* at 1028. Plaintiffs claimed that the IRS was not enforcing the Code's prohibition on lobbying by religious tax-exempt organizations. The allegation was that by not halting the lobbying practices of these organizations, the IRS was acting in *contravention* of the express terms of the statute and *disregarding* congressional intent. *Id.* at 1027–28. The Second Circuit held that plaintiffs were not challenging the underlying statute and Congress' exercise of its taxing and spending power either facially or as applied. Rather, plaintiffs were challenging the actions or lack of actions of executive branch employees. *Id.* Accordingly, the *USCC* Court concluded

that there was no nexus between plaintiffs' allegation and Congress' exercise of their taxing and spending power. *Id.* at 1028. Therefore, plaintiffs lacked standing.

In the present action, plaintiffs are not claiming that the actions taken by AID contravene a statute. Unlike the plaintiffs in *USCC*, the taxpayers in this action claim that Congress, in its broad delegation of power under Section 2174, actually authorized ASHA's expenditures. The logical extension of plaintiffs' argument is that AID, as administrator, is simply implementing that which Congress legislated. As regulator, AID developed criteria to implement the program according to the statute. Criterion 8, for example, requires that ASHA funded institutions must be open to all persons and that ASHA funds not be used to train persons for religious pursuits or to construct facilities intended for worship or religious instruction. This criterion imposes no other restrictions e.g., that institutions not be pervasively sectarian. As such, plaintiffs contend that the funding challenged here is consistent with the broad congressional mandate. Plaintiffs do not allege that AID acted against congressional will, but rather that the statute, as applied by AID, is unconstitutional. Consequently, the nexus requirements outlined in *Flast*, affirmed in *Kendrick* and explained in *USCC* are satisfied by plaintiffs in the present action.

Defendants argue that in *Kendrick* and *Flast*, where the Supreme Court held that federal taxpayers had standing, the relevant statutes expressly directed aid to sectarian institutions. This is arguably correct in *Kendrick* where the statute at issue explicitly indicated that religious organizations *may* be involved in program implementation of The Adolescent Family Life Act, 42 U.S.C. § 300z *et seq.* (1982 ed. and Supp. IV); *See also Kendrick*, 487 U.S. 589, 606, 108 S.Ct. 2562, 2572. In *Flast*,

however, the statute at issue had no language pertaining to religious institutions. *See* 20 U.S.C. § 241e(a)(2); 20 U.S.C. § 823(a)(3)(B). Plaintiffs in *Flast* did not challenge a statutory directive of funds to private schools, but rather the actual delivery of some of the funds to sectarian schools, which was an executive decision authorized by the legislation. *See* 392 U.S. at 86, 88 S.Ct. at 1945; *See also Walker v. San Francisco Unified School District*, 741 F.Supp. 1386 (N.D.Calif.1990). In "as applied" challenges, the Supreme Court has held standing exists whether or not the language in the statute specifically mentions the role of sectarian organizations. The facts in *Flast* and the "as applied" theory articulated in *Kendrick* are similar to the circumstances and claims that appear in this case. Therefore, plaintiffs have standing to challenge the ASHA Program.

This Court, however, does not reach the conclusion that plaintiffs have standing without doubt and a significant examination of the relevant case law. There is a paradox in the law of standing which this Court notes but does not find dispositive. If a taxpayer plaintiff challenges an act of Congress passed pursuant to the Taxing and Spending Clause as constitutionally invalid under the Establishment Clause, the Supreme Court has held standing exists. *Flast*, 392 U.S. at 106, 88 S.Ct. at 1955. Thus enactments which have been determined by the Congress and the President to pass constitutional muster are judicially reviewable. The paradox is that standing is denied when a taxpayer complaint centers on a decision made by an executive branch official or employee alleged to be violative of congressional directions. Actions which do not have the added protection of congressional and presidential approval are not judicially reviewable,[1] al-

---

1. Defendants suggested in oral argument that if a potential grantee could show it suffered an injury in fact because a grant was made to a competing sectarian institution, it would have a colorable claim for standing. Under *USCC* it is not clear that this is correct, but nonetheless, that issue is beyond the scope of this case. 885 F.2d 1020, 1027–1029. Even if the ASHA pro-

gram was non-reviewable, this Court would still be bound by the above standing requirements. The Supreme Court has been untroubled by the fact that certain government actions are beyond review. *See Valley Forge*, 454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reservists Committee*, 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974).

though actions with these protections are subject to such review. In the end, it may be that standing is an imperfect doctrine but this Court, while noting the paradox, does not need to resolve it in order to decide this case. We conclude plaintiffs have standing to maintain this action.

## B. Political Question

■ The second threshold question goes to the nature of the claim asserted and whether it is barred by the political question doctrine. Unlike issues involving standing, the court is not concerned with the plaintiffs' injury or the potential for remedy. Rather, the focus is on the claim itself and whether it asserts a judicially enforceable right derived from a provision of the Constitution. If the court finds a constitutional right at stake in a question that involves international programs, the court must determine whether it has jurisdiction to hear the claim on the merits in a manner consistent with the separation of powers embodied in the Constitution which assigns the direction of foreign policy to the legislative and executive branches of government.

In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the seminal case on justiciability, the Supreme Court addressed the parameters of the political question doctrine by outlining a number of criteria to identify non-justiciable issues. *Id.* at 211, 82 S.Ct. at 706. In applying these criteria to questions involving relations among nations of the world, the Court was clear in its direction that the judiciary is not competent to establish United States foreign policy. According to the Court, this country's relations with other nations is constitutionally committed to Congress and the executive branch and such issues are "best addressed in a single-voiced statement of the government's views." *Id.* at 210–211, 82 S.Ct. at 706.

This general rule is not absolute. As the Court in *Baker* subsequently noted, "it is an error to suppose that every case and controversy which touches foreign relations is beyond judicial cognizance." 369 U.S. at 211, 82 S.Ct. at 707; *see also Japan*

*Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 229, 106 S.Ct. 2860, 2865, 92 L.Ed.2d 166 (1986). The courts cannot reject as "no lawsuit" a bona fide controversy as to whether a concededly "political" action exceeds constitutional authority. *Id.* at 217. If the constitutional provision invoked by a litigant can successfully be translated into judicially enforceable rights, the case can not be held non-justiciable. *See United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); *see also Planned Parenthood Federation v. Agency for International Development,* 838 F.2d 649, 655 (2nd Cir.1988). The executive branch in prescribing foreign policy must "choose a constitutionally permissible means of implementing" their enumerated powers. *INS v. Chadha,* 462 U.S. 919, 940–43, 103 S.Ct. 2764, 2778–80, 77 L.Ed.2d 317 (1983); *see also Reid v. Covert,* 354 U.S. 1, 6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957).

Since there are no bright line standards in the political question doctrine, courts must balance the competing forces. This involves engaging in "a discriminating analysis of the particular question posed." *Baker,* 369 U.S. at 211, 82 S.Ct. at 707 (quoted in *Olegario v. United States,* 629 F.2d 204, 217 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981)). Particular consideration must be given to the historic "management by the political branches" of a particular question and its susceptibility to judicial handling "in light of its nature and posture." 369 U.S. at 211, 82 S.Ct. at 707.

This case involves an international grant program established by the Congress and administered by an executive branch agency. The recipients are United States institutions or sponsors that have founded schools abroad which serve as study and demonstration centers for ideas and practices of the United States. *See* 44 Fed.Reg. No. 228 (Nov. 26, 1979). Although the funding provided to sponsors are passed entirely to the foreign school, administration and accounting for the funds is done by the private United States supporting entity. While this case involves foreign affairs, it is primarily about United States

non-profit organizations and their non-governmental affiliates overseas. *See* Criterion 1 at 44 Fed.Reg. No. 228 (Nov. 26, 1979). It does not involve the direct relationship between the United States and a foreign government. As such, plaintiffs have alleged what is a judicially enforceable right under the Establishment Clause of the First Amendment.

Defendants urge that even if plaintiffs have alleged a judicially enforceable right, the question in this case is non-justiciable because actions and decisions about programs outside this country are issues of foreign affairs which are the exclusive responsibility of the executive branch. They argue in essence that under *Baker* this Court by deciding the case would exhibit a lack of respect for the coordinate branches of government. 369 U.S. at 211, 82 S.Ct. at 706.

If the statutory framework were one in which grants were made directly to foreign governments or possibly to foreign entities, defendants' non-justiciability argument would be highly persuasive. *See Dickson v. Ford,* 521 F.2d 234, 236 (1975). The flaw in defendants' analysis is that Congress internalized the international grant program. According to the statutory language the "President is authorized to furnish assistance ... to schools ... founded or sponsored by United States citizens ..." 22 U.S.C. § 2174(a). The criteria promulgated by AID further emphasizes the United States component to the program. In Criterion 1, an applicant is required to be a "non-profit U.S. organization which either founded or sponsors the institution for which assistance is sought" and states that the applicant should be "tax-exempt under Section 501(c)(3) of the Internal Revenue Code of 1954." *See* 44 Fed.Reg. 228 (Nov. 26, 1979).

At oral argument this Court inquired, for purposes of determining justiciability, whether this situation differed from that which would be present if a grant were made to a religious order in the United States solely for its overseas missionary activities. The Court found no satisfactory answer to distinguish this hypothetical from the present case for purposes of justiciability. In essence, United States religious non-profit organizations are promoting and supporting their affiliates which are allegedly engaged in spreading a particular religious faith.

By analyzing the specific question posed we conclude that this case may not be considered non-justiciable because of its overseas dimension. *Baker,* 369 U.S. at 211, 82 S.Ct. at 706. The specific terms of the statute at least encourage, if not require, that the grant program have a strong connection with a United States organization. Further support of the program's "internal" aspects are the AID criteria requiring the involvement of United States entities. The strong nexus between United States non-profit organizations and the non-governmental foreign entities is such that the case presents a justiciable case or controversy which is not barred by the political question doctrine.

C. General Applicability of the Establishment Clause to United States Sponsored Programs Abroad

■ The last of the three threshold questions involves the general applicability of the Establishment Clause to the challenged ASHA program. This case presents a novel question since the program has both United States involvement and overseas components. Certainly government funding of sectarian non-profit organizations in this country for any activities would be subject to First Amendment limitations. *See Everson v. Board of Education,* 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). On the other hand, if the government were to provide funds to a foreign government which used the money to promote religion through sectarian agencies, Establishment Clause restrictions would not apply. *See Chicago & Southern Air Lines Inc. v. Waterman Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948), *Coleman v. Miller,* 307 U.S. 433, 454–55, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939), *Dickson v. Ford,* 521 F.2d 234, 236 (5th Cir.1975). It is the involvement of United States religious organizations with overseas programs that causes this case to

fall into a grey area that is not clearly defined by existing doctrine.

■ There is little in the way of direction on this issue from the courts or Congress. The Supreme Court has addressed the applicability of the Constitution abroad primarily in the areas of national security and criminal procedure. *See, e.g., United States v. Verdugo–Urquidez,* ___ U.S. ___, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).[2] None of this jurisprudence lends itself to an analytical framework by which to apply First Amendment guarantees. The kinds of concerns expressed in national security cases are far removed from those involved in educational programs. Moreover, Congress has yet to speak definitively on the impact of international political pressures on traditional church and state separation standards.

Even without exact judicial or legislative guidelines in this field of inquiry, both religious groups and the government are aware of potential Establishment Clause limitations. As J. Bruce Nichols writes in *The Uneasy Alliance: Religion, Refugees Work and U.S. Foreign Policy,* "The interpretation of domestic law ... substantially determines the tone and enforcement of congressional legislation and related administration regulations" in international development program implementation. *Id.* at 214. In the present case this is certainly noticeable. AID published criteria which include prohibitions against government money being used "to train persons for religious pursuits or to construct building or other facilities intended for worship or religious instruction". *See* Criterion 8 at 44 Fed.Reg. No. 228 (Nov. 26, 1979). Certainly these criteria, limited as they may be, *see, supra* page 8, result from a respect for domestic Establishment Clause principles and standards.

These concerns and precautions are prudent since the "United States [government] can only act in accordance with all the limitations imposed by the Constitution." *Reid v. Covert,* 354 U.S. 1, 6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957). This is particularly true in cases involving the First Amendment since there is a strong constitutional guarantee that federal taxpayers' money will not be used in a way that has the effect of advancing religion. *See Everson,* 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711; *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). As Justice Black wrote in *Everson,* "No tax in any amount ... can be levied to support any religious activities or institutions whatever they may be called ... to teach or practice religion." 330 U.S. at 16, 67 S.Ct. at 511. No limitation to this guarantee has been articulated by the Supreme Court for programs that operate overseas with the assistance of private United States sectarian non-profit organizations. Whether the advancement of religion occurs in the United States or abroad is simply not relevant to the United States taxpayer who objects to United States sectarian institutions receiving federal money for use in promoting religion.

The primacy of the tax factor has traditionally been recognized only in challenges involving the religion clauses of the Constitution. *See Flast,* 392 U.S. at 83, 88 S.Ct. at 1942. In fact, it is only in these types of challenges that the Supreme Court has held that taxpayers have standing to sue the government. Standing was found in *Flast* because the Establishment Clause "operated as a specific constitutional limitation upon the exercise by Congress of the

---

**2.** In *Planned Parenthood Federation of America v. Agency for International Development,* 915 F.2d 59 (2nd Cir.1990), the Second Circuit held that the executive branch may *restrict* federal assistance to foreign nongovernmental family planning organizations without violating the First Amendment right of free speech of either the foreign agencies or their United States sponsors. The Court held that a "mere refusal to subsidize a fundamental right 'places no governmental obstacle in the path' of a plaintiff seeking to exercise that right." *Id.* at 63. Plaintiffs in this case are challenging the government's *expenditure* of money in violation of a right and argue that the government has an obligation not to use taxpayer money to advance religion. As such the *Planned Parenthood* case is not applicable. Yet, by addressing whether the foreign agencies rights had been abridged, the Court appears to indicate that the First Amendment is applicable overseas. *Id.* at 62–63.

taxing and spending power conferred by Art. I, § 8." *Id.* at 104, 88 S.Ct. at 1954. The Court explained that "[o]ur history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used ... to support religion in general." *Id.*

Defendants argue that *Flast* is not relevant since the ASHA program is international in nature such that many provisions of the Constitution, including the Establishment Clause, are not applicable. Relying on *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 222, 81 L.Ed. 255 (1936), defendants suggest that "neither the Constitution nor laws passed in pursuance of it have any force in foreign territory." *Id.* at 318, 57 S.Ct. at 220. Yet in *Curtiss* the Court had significantly different concerns than those defendants agree are involved in the ASHA program. In *Curtiss* there were national security issues that involved the use of arms in a situation that was "entirely external" to the United States. *Id.* at 315, 57 S.Ct. at 218. Although United States citizens were involved with munitions sales in this country, there was no United States involvement in the overseas activity—a civil war. *Id.* In this action the federal grants are channeled through domestic entities, for non-military and non-national security purposes. Further, United States citizens are involved in every step of the process both in this country and abroad such that the program is not "entirely external." *Id.*

Defendants further suggest that recent Supreme Court precedent involving the applicability of the Fourth Amendment overseas is relevant to this action. In *United States v. Verdugo*, 110 S.Ct. at 1059, the Court held that Fourth Amendment protections do not apply to searches and seizures by United States officials of non-resident aliens' premises and property located in a foreign country. The Court found that the nexus between the plaintiff, a Mexican citizen, and the United States was too remote. *Id.* at 1066. Focusing on the language of the Fourth Amendment, the Court concluded that Fourth Amendment rights are limited to the "people", which is a defined class of people, who have "some societal obligation" to this country such as citizens or permanent residents. *Id.* at 1061. The Court held that the Mexican plaintiff had established no such connection. In furthering the nexus analysis the Court in *Verdugo* reasoned that if they held otherwise "aliens *with no attachment* to this country might well bring actions ... to remedy violations of the Fourth Amendment [that occurred] in *foreign countries.*" (emphasis added) *Id.* at 1065.

These nexus problems do not exist in the present action. Although the funds are solely for the use of foreign schools, the involvement of the "people" of the United States is significant. *See Verdugo*, 110 S.Ct. at 1061. Plaintiffs are United States citizens asserting a fundamental constitutional right that United States taxpayer money may not be used to support the advancement of religion. *Cf. Everson*, 330 U.S. at 1, 67 S.Ct. at 504. Moreover, there is little potential for a suit in this country by a person attending a foreign school. Few, if any of the pupils are United States taxpayers with standing.

Another concern of the Court in *Verdugo*, which built on the issues the Supreme Court addressed in *Curtiss*, was the relationship between the Fourth Amendment and national security. The Court in *Verdugo* held that the Government had legitimate concerns about being unduly constrained by the Fourth Amendment in its foreign affairs activities involving "law enforcement" and the armed forces. 110 S.Ct. at 1066. As the Court wrote, "situations threatening important American interests may arise halfway around the globe, situations which in the view of the political branches of our Government require an American response with armed force." *Id.* This Court identifies no direct relationship between educational programs and national security interests. The ASHA program has no relevance to issues involving the armed forces of this country and no other "entirely external" questions are directly at issue in the present case. *Id.*

For the same "entirely external" reasons the Insular Cases that defendants cite are inapposite. It is correct that the Insular Cases are a set of proceedings which involve the extent to which United States constitutional provisions apply abroad and are therefore peripherally relevant. Yet, all but one case involved the criminal rights of the accused in proceedings brought by non-United States authorities in non United States courts. *See, E.g. Balzac v. Puerto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (Fifth Amendment right to jury trial inapplicable to Puerto Rico); *Ocampo v. United States,* 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914) (Sixth Amendment Grand Jury provision inapplicable in the Philippines); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904) (jury trial provision inapplicable in the Philippines); *Hawaii v. Mankichi,* 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903) (provisions on indictment by grand jury and jury trial inapplicable in the Hawaiian Territory); *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) (revenue clauses of the Constitution inapplicable to Puerto Rico). A further limitation in applying these cases to this action is the Supreme Court's direction that "neither the cases nor their reasoning should be given any further expansion." *Reid,* 354 U.S. at 14, 77 S.Ct. at 1229.

The final argument advanced by the defendants on the limits of the application of the Establishment Clause to this action is an historical analysis of the role the Framers envisioned for the First Amendment. A problem with this argument is that the Supreme Court has been clear in its direction that "too literal a quest for the advice of the Founding Father", at least in areas not involving national security, is unhelpful to the disposition of present conflicts. *Abington School Dist. v. Schempp,* 374 U.S. 203, 237, 83 S.Ct. 1560, 1579, 10 L.Ed.2d 844 (1963). The language "Congress shall make no law respecting an establishment of religion, or prohibiting the exercise thereof ..." reflects a principle. According to the Supreme Court, the Framers' purpose "was to state an objective, not to write a statute." *Walz v. Tax Com. of New York,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). Many issues today, particularly in the foreign affairs realm, were never envisioned by the Framers. *Wallace v. Jaffree,* 472 U.S. 38, 67, 105 S.Ct. 2479, 2495, 86 L.Ed.2d 29 (1985). As such this Court finds defendants' suggested historical analysis informative but inconclusive.

This Court concludes, on balance, that domestic Establishment Clause standards are applicable to the ASHA program. Although ASHA funds school programs overseas, the involvement of private United States institutions in the process of implementing various activities is significant. The United States sponsor is required to "demonstrate a continuing supportive relationship" with the foreign school which may be evidenced by "the provision of financial and management support" *See* Criterion 1 at 44 Fed.Reg. No. 228 (Nov. 26, 1979). Further, "a significant number" of faculty and staff must be "United States citizens." *See* Criterion 5 at 44 Fed.Reg. No. 228 (Nov. 26, 1979). Apparently, some of the overseas schools are operated by the affiliates of United States religious organizations. *See* oral argument transcript at 16.

Defendants argue that even though the Establishment Clause is applicable to some activities overseas, it should not apply to the ASHA program. Defendants suggest that in most countries where ASHA funds are used, the foreign government mandates the teaching of religion and that pervasively sectarian standards will bar grants to most schools in the nation. The unavailability of non-sectarian schools appears to be less absolute than defendants suggest. Plaintiffs do not challenge all the grants awarded and a review of the grantees in 1989, according to AID's data, shows that most countries have schools that are either secular in nature or not pervasively sectarian and able to further United States "ideas and practices." *See* Plaintiffs' Exh. 9. The application of Establishment Clause standards may require defendants to expand their search for United States sponsors and institutions that are more able to

further our Constitution's "ideas and practices" which includes our views on the interrelationship of government and religion.

A further question raised by defendants in terms of applying the Establishment Clause is whether the United States should be concerned with advancing religion in sectarian states far from our borders. As defendants write in their brief, a fear "about American aid resulting in the advance of Judaism in Israel would certainly be anomalous given the fact that the Government of Israel itself funds religious services and education." Defendants' memorandum of law at 70. The Court does not agree. The source of the constitutional limitation in this case comes from the concern for United States taxpayers and the use of their money to fund programs that advance religion. Nothing in Supreme Court jurisprudence or a congressional mandate limits this concern because the funded programs are overseas when United States organizations are involved.

Our holding today does not eliminate the important role that sectarian non-profits play in international educational development programs. Thomas Jefferson's wall of separation between church and state is no longer as solid as it was when the Supreme Court first discussed the religion clauses. *See E.g. Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878). Establishment Clause jurisprudence in the last decade has evolved to recognize that religious institutions are an asset to social programs. *Kendrick*, 487 U.S. at 594–95, 108 S.Ct. at 2566–67. The Supreme Court has balanced the government's need to have sectarian institutions involved in such problems as teenage pregnancy with Establishment Clause guarantees. *Id.* The result has been to allow Congress to fund activities that have a purely secular purpose. *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111. It is to this standard that the ASHA program would be subject.

III. *Application of Establishment Clause Standards to the Challenged Grants under the ASHA Program*

In this action, plaintiffs specify twenty schools receiving ASHA funds that alleg-edly violate Establishment Clause guarantees. These institutions, both secondary schools and universities, are affiliated with United States sponsors of either the Jewish or Catholic faiths. In the case of the challenged Jewish schools, all are located in Israel. The Catholic schools are spread in different geographical areas of the world.

Plaintiffs have moved for summary judgment and defendants have made a cross motion for summary judgment. Summary judgment may be granted if there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating "the absence of any material factual issue genuinely in dispute." *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). In determining whether or not there is a genuine factual issue, a court must resolve all ambiguities and draw all inferences against the moving party. *United States v. Diebold Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *see also* Advisory Committee Notes to the 1963 Amendments to Rule 56.

In the context of the summary judgment motions, our focus turns to the question of the legal framework, based on domestic standards, by which the grants to these twenty schools must be measured for compliance with the Establishment Clause. The Establishment Clause is designed to ensure that the advancement of any religion comes from the voluntary support of its members and not from the political or financial support of the state. *See Walz*, 397 U.S. at 668, 90 S.Ct. at 1411. As the Supreme Court wrote in *Walz* "the establishment of religion connote[s] sponsorship, financial support and active involvement of the sovereign in religious activity." *Id.*

By analyzing the cumulative criteria developed over the years, the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) established what have become the governing principles in determining whether the Establishment Clause has been violated in a given case. In *Lemon*, the Court

1054

articulated three tests that a statute must pass in order for a court to rule that a law does not violate the Establishment Clause. First, "the statute must have a secular legislative purpose." *Id.* at 612, 91 S.Ct. at 2111. Second, its principal or primary effect must be one that neither advances nor inhibits religion. *Id.* (citing *Board of Education v. Allen,* 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968). Finally, the statute must not foster "an excessive government entanglement with religion." *Id.* at 613.

The Foreign Assistance Act of 1961 clearly meets the first factor of the *Lemon* test since it has a valid secular purpose. Congress had the legitimate aim of increasing aid money and United States influence in friendly countries around the world through non-profit organizations. United States ideas and values were to be made available to citizens of many developing countries through a number of non-governmental schools. There is nothing inherently "religious" about the Act's purpose.

It is the second *Lemon* factor, whether the primary effect of the challenged statute is to advance religion, either on its face or as applied, which is the keystone of plaintiffs' claim in this litigation. The Act is certainly neutral on its face about the involvement of religious institutions. The AID criteria define eligible grant applicants merely as "non-profit U.S. organizations." *See* Criterion 1 at 44 Fed.Reg. 228 (Nov. 26, 1979). Nothing in the Act or criteria suggests that religious affiliation is a significant criteria for selection. There is also nothing to suggest that religious institutions are ineligible to participate in the ASHA program. *c.f. Kendrick,* 487 U.S. at 609, 108 S.Ct. at 2574. The question remaining is whether the statute, as applied, is impermissible in that it has the primary effect in any instance of advancing religion. *Id.*

The participation of a religious organization in the ASHA program or any other government funded activity is not necessarily a violation of the Establishment Clause. The Supreme Court has never held that the First Amendment requires religious institutions to be shielded entirely from participation in federal grant programs. *See E.g. Bradfield v. Roberts,* 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899). In *Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), the Court stated that "religious institutions need not be quarantined from public benefits that are neutrally available to all." *Id.* at 746, 96 S.Ct. at 2344. The Court upheld a statute which provided state funds to any private institution of higher learning, including religious colleges, which met certain minimum requirements and awarded more than just theological degrees. *Id.* Further, in *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) and *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the Supreme Court upheld statutes that provided construction grants to higher educational institutions, including those that had a religious affiliation, for buildings that were to be used for secular purposes only.

A law may not be invalidated because the secular effects government seeks to accomplish are realized in a religious environment. *See Corporation of Pres. Bishops of the Church of Jesus Christ of the Later–Day Saints v. Amos,* 483 U.S. 327, 334, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987). The law need only require that any state money be utilized entirely for secular purposes which are easily distinguished from sectarian activities without on-site monitoring. *Roemer,* 426 U.S. at 760, 96 S.Ct. at 2351. Otherwise, religious groups would be subject to discrimination in violation of the First Amendment's Free Exercise Clause since "state power is no more to be used so as to handicap religions than it is to favor them." *Everson,* 330 U.S. at 18, 67 S.Ct. at 513.

In other words, religiously affiliated organizations are permitted to use government aid in ways that do not have the direct effect of advancing religion. In *Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Court established an "effects" inquiry with "a consideration of the nature of the institution in which the [challenged]

programs operate." *Id.* at 384, 105 S.Ct. at 3222. If the institution receiving government funds is "pervasively sectarian," the concern is that "even if [the money] is designated for specific secular purposes, [it] many nonetheless advance ... the institution's religious mission." *Kendrick*, 487 U.S. at 610, 108 S.Ct. at 2574.

Determining whether a religious educational institution is pervasively sectarian involves a number of inquiries, most of which are factual. By definition, pervasively sectarian institutions include "schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." *Aguilar v. Felton*, 473 U.S. 402, 412, 105 S.Ct. 3232, 3237, 87 L.Ed.2d 290 (1985). Parochial schools at the primary and secondary level are the institutions that the Supreme Court has found most suspect under this standard with the result that most forms of government aid are denied to these schools. *See Wallace v. Jaffree*, 472 U.S. 38, 110–11, 105 S.Ct. 2479, 2517–18, 86 L.Ed.2d 29 (1985); *Meek v. Pittenger*, 421 U.S. 349, 363, 95 S.Ct. 1753, 1762, 44 L.Ed.2d 217 (1974).

Aid to primary and secondary parochial school students has only been found acceptable when it flows directly to the student or parent and does not involve the school. This includes programs such as those that loan secular textbooks to students at government expense, *See Wallace*, 472 U.S. at 110–11, 105 S.Ct. at 2517–18, state assistance in supplying bus transportation to parochial schools, *See Everson*, 330 U.S. at 1, 67 S.Ct. at 504, and administering standardized tests to pupils. *See Wolman v. Walter*, 433 U.S. 229, 238, 97 S.Ct. 2593, 2600, 53 L.Ed.2d 714. Direct payment by the state to religious schools, however, has been struck down as a violation of the Establishment Clause. *See Grand Rapids*, 473 U.S. at 393, 105 S.Ct. at 3227; *Public Education v. Regan*, 444 U.S. at 646, 100 S.Ct. at 840.

Although the definition of pervasively sectarian has not been reformulated in cases involving higher education, the stan-dards have been applied differently. The Supreme Court has allowed direct government aid to religious institutions for secular purposes. *See Tilton*, 403 U.S. at 672, 91 S.Ct. at 2093; *Roemer*, 426 U.S. at 736, 96 S.Ct. at 2337. One major reason for the difference is the age of the students. As the Court wrote in *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), "university students are less impressionable than younger students and should be able to appreciate that the university's policy is one of neutrality toward religion." *Id.* at 274, 102 S.Ct. at 276.

■ Applying the primary effects test outlined in *Lemon* to the challenged grants is a substantial task given the large number of institutions challenged. Since this is a motion for summary judgment, plaintiffs must establish that there are no genuine material issues of fact and that as a matter of law all of the twenty schools challenged are pervasively sectarian. This burden is particularly onerous since the record before this Court contains numerous factual disputes including the most basic information pertaining to each challenged institution. In all twenty of the challenged schools, plaintiffs and defendants disagree on most of the factors that determine the nature of an institution which dictates whether it is pervasively sectarian.

To illustrate the difficulty of disposing of this case on a summary judgement motion, a cursory analysis into even one of the twenty schools is dispositive. Beth Rivka Lubavitcher Girls School and Teachers College, one of the institutions challenged by the plaintiffs, is located in Kfar Chabad, Israel. It is sponsored by The Merkos L'Inyonei Chinuch, a non-profit United States organization which is the educational arm of the Lubavitch movement. Plaintiffs' Exh. BR4. The parties agree that the purpose of the ASHA grant in this instance was to construct classrooms for the Beth Rivka Teachers College. It appears also that plaintiffs and defendants agree the purpose of the grant is secular. No agreement exists, however, on the facts that relate to a determination of whether the

High School or College is pervasively sectarian.

Plaintiffs allege, based on the institution's certificate of incorporation and brochures, that a main purpose of the organization is to train and educate Jewish women in accordance with the Torah and to spread the Jewish faith "in a Torah atmosphere." Plaintiffs' Exh BR 1. According to plaintiffs' translations of Beth Rivka's admission brochure "every student must major in Judaism studies (Bible, oral religious law, Halacha, Chassidism). The purpose of these studies is to grant the student knowledge for teaching and for fulfillment." Plaintiffs' Exh. BR 15. Plaintiffs state that any non-religious activities are incidental to the institution's religious mission.

Plaintiffs also provide a number of exhibits that document AID's concerns about the pervasively sectarian nature of the school. According to internal confidential memoranda at AID the Lubovitcher movement is an orthodox group with a strong religious orientation. Plaintiffs' Exh. BR 6. According to plaintiffs' exhibits, the ASHA staff in evaluating this institution gave it low ratings because it was "strongly sectarian" and enrollment was "limited to the orthodox and to those of Lubavitch persuasion." *Id.* Even if the aid was for secular purposes, plaintiffs argue it is impermissible because the institution is pervasively sectarian.

Defendants refute plaintiffs' factual representations about the institution. In their exhibits and affidavits, defendants state that Beth Rivka is a three year teacher training program with basic courses in religious studies and non-sectarian subjects such as mathematics, computer literacy, physical education and art. Declaration of Bernard W. Bell, Exh. A at 10. Further, defendants claim that permissible majors at the college include Chassidic Thought, language and expression, geography, mathematics, computers, English and special education. *Id.* at 11. According to defendants the school describes its goal as "train[ing] superior educators who are well-versed in Chassidic knowledge and in broad general knowledge." Santos Dec., Exh. 17.

Defendants further rely on Beth Rivka's representations on the grant application to AID for ASHA program funding in refuting plaintiffs' allegations. According to Beth Rivka's sponsor in the United States "the school prepares, among others, children of immigrant families from Eastern Europe to live and participate in the democratic society of Israel." Santos Dec., Exh. 17. In evaluating the nature of the institution overall, defendants suggest that Beth Rivka is similar to most religious colleges and universities in the United States that receive federal funds for secular activities.

Since this grant funded a secular activity at a religious college the applicable standards to determine whether Beth Rivka is pervasively sectarian are those articulated in *Roemer, Tilton,* and *Hunt. See Roemer,* 426 U.S. at 739, 96 S.Ct. at 2341; *Tilton,* 403 U.S. at 682, 91 S.Ct. at 2097; *Hunt,* 413 U.S. at 743, 93 S.Ct. at 2874. Applying these standards to this case would require the Court to make material factual decisions. Plaintiffs and defendants present different pictures of the same institution. A lack of factual consensus exists on such issues as the nature of religious limitations on conduct and the goals of the school, the curriculum and the composition of the student body and faculty. Regardless of the standard chosen, the Court is being asked to weigh competing factual claims, resolve evidence in conflict and judge credibility. This is impermissible in a summary judgment motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Gibson v. American Broadcasting Co.,* 892 F.2d 1128, 1132 (2d Cir. 1989); *American Manufacturers Mutual Insurance Co. v. American Broadcasting–Paramount Theatres, Inc.,* 388 F.2d 272, 284 n. 18 (2d Cir.1967). Since any resolution to this conflict would require just such an approach, this Court must deny both plaintiffs' and defendants' motions for summary judgment.

### IV. *Certification*

As the Court stated at the opening of this opinion, all the threshold issues will be certified to the Second Circuit before a final judgment is rendered. To certify a decision for an interlocutory appeal, a lower court must determine that an order or decision in a civil case "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal ... may materially advance the ultimate termination of the litigation ..." 28 U.S.C. § 1292(b). *See also Red Bull Associates v. Best Western International, Inc.,* 862 F.2d 963, 965 n. 5 (2d Cir.1988). Additionally, the controlling question of law must not only be determinative to the action but must also have a "precedential value for a large number of other suits." *Brown v. Bullock,* 294 F.2d 415, 417 (2d Cir.1961) The Court believes all these requirements are met in this instance.

In this case there are a number of novel issues. All of the threshold questions involve "controlling questions of law." A resolution of any of these issues by immediate appeal adverse to plaintiffs will "ultimately terminate the litigation." 28 U.S.C. § 1292(b). Further, this Court believes that certification would have a precedential value to other cases. *Brown,* 294 F.2d at 417. On this basis the Court has decided to certify the portions of this decision that involve new and important areas of the law. This includes three specific issues. First, it is not entirely certain under recent Second Circuit case law whether plaintiffs in this case have standing. Second, a question arises as to whether plaintiffs are barred by the political question doctrine. Finally, there are close issues as to the applicability of the Establishment Clause to actions that involve United States non-profit organizations which have founded and continue to be involved with foreign non-governmental entities. For the reasons mentioned, the Court certifies this decision for an interlocutory appeal.

### V. *Conclusion*

Plaintiffs' motion for summary judgement is denied since there are material issues of fact concerning which of the challenged schools are pervasively sectarian based on the second prong of the *Lemon* test. 403 U.S. at 612, 91 S.Ct. at 2111. It is not necessary to go through each of the challenged schools, although the Court has done so to the extent necessary to confirm that the example cited in detail is reasonably typical. The same types of genuine material issues of fact that exist in evaluating the Beth Rivka school are at issue throughout. Since plaintiffs' summary judgment motion does not survive the pervasively sectarian test, this Court need not address the third *Lemon* standard concerning issues of entanglement at this time. *Id.* at 613, 91 S.Ct. at 2111.

Defendants' motion for summary judgment on the issues of standing, the political question doctrine and the non-applicability of domestic Establishment Clause standards is also denied for the reasons explained in the opinion.

SO ORDERED.